# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: RM Bakery LLC and BKD Group LLC

Bankruptcy Case No.: 20−11422−mg

Beldotti Bakeries LLC
Michael Beldotti
Christopher Beldotti

Plaintiff(s),

−against−

Adversary Proceeding No. 20−01204−mg

RM Bakery LLC

Defendant(s)

# SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
# IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: | |
|---|---|
| | **Clerk of the Court** |
| | **United States Bankruptcy Court** |
| | **Southern District of New York** |
| | **One Bowling Green** |
| | **New York, NY 10004−1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: | |
|---|---|
| | **Andrew M La Bella** |
| | **Andrew M. LA Bella** |
| | **100 Waverly Road** |
| | **Scarsdale, NY 06905** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court | Room: Courtroom 523 (MG), One Bowling |
|---|---|
| Southern District of New York | Green, New York, NY 10004−1408 |
| One Bowling Green | |
| New York, NY 10004−1408 | Date and Time: 9/22/20 at 10:00 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 8/11/20

Vito Genna
_____

*Clerk of the Court*

By: /s/  Carmen Ortiz
_____

*Deputy Clerk*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: RM BAKERY LLC, et al., Debtors
……………………………………….. x      Chapter 11
BELDOTTI BAKERIES LLC,
MICHAEL BELDOTTI and
CHRISTOPHER BELDOTTI          :          Case No. 20-11422 (MG)
                                         Jointly Administered

    Plaintiffs                 :

        v.                 :          ADVERSARY DOC. NO.

RM BAKERY LLC                 :

    Defendant
……………………………………… x

## COMPLAINT

## COUNT ONE: BELDOTTI BAKERIES LLC

1.  The plaintiff Beldotti Bakeries LLC was and is at all times hereinafter referred to a foreign limited liability company formed and existing under the laws of the State of Connecticut and residing therein and registered to do business in the State of New York.

2.  The plaintiff Michael Beldotti was and is at all times hereinafter referred to as a resident of the State of Connecticut.

3.  The plaintiff Christopher Beldotti was and is at all times hereinafter referred to as a resident of the State of Connecticut.

4.  On information and belief and at all times hereinafter referred to, the defendant RM Bakery LLC, was a foreign limited liability company formed under the laws of the State of Delaware and registered to do business in the State of New York in the County of Queens.

1

5. This is an action under 11 U.S.C.A. Sec. 727(c) objecting to the discharge of the defendant Debtor RM Bakery LLC. The court has jurisdiction of this case pursuant to 28 U.S.C.A. Section 1334.

6. Proper grounds exist for denial of the discharge to the Debtor and plaintiffs object to granting of discharge of the Debtor, particularly as to the Debt of the defendant to the plaintiffs as described below.

7. On or about July 31, 2018, the plaintiff Beldotti Bakeries LLC as seller, and the defendant RM Bakery LLC as purchaser, entered into a written asset purchase agreement (hereinafter referred to as "the APA") for the purchase of the assets of the plaintiff's wholesale bakery which was doing business under the name Good Bread Bakery a copy of the executed APA with executed attachments is attached hereto as Exhibit 1.

8. Pursuant to Article 2.1(b) of the APA, the defendant was to make deferred payments totaling $125,000.00 to the plaintiff Beldotti Bakeries LLC beginning 30 days after the closing that took place on July 31, 2018.

9. Pursuant to Article 2.2 of the APA the above referenced deferred payment was to be paid in 24 equal monthly installments in the amount of $5,208.33 starting on August 30, 2018.

10. Article 2.2 of the APA provides that if the plaintiff Beldotti Bakeries LLC did not receive any payment within 10 days after the due date thereof the defendant shall pay to the plaintiff a late charge equal to 5% of the overdue payment.

11. Article 2.2(c) of the APA provides that should defendant fail to timely make three payments to the plaintiff Beldotti Bakeries LLC than within eighty days after receipt of written notice to the defendant from the plaintiff that such monthly payment has not been

received, that all remaining monthly installments due on the deferred amount shall become due and payable immediately to plaintiff.

12. The defendant only made three monthly installment payments in the amount of $5,208.33 to the plaintiff Beldotti Bakeries LLC and failed to make any other installment payments due, leaving a balance due in the amount of $109,375.01 as to the deferred payment plus late charges of 5% on each late monthly installment.

13. On October 25, 2019 the plaintiff Beldotti Bakeries LLC, pursuant to Articles 2.2(c) and 9.3 of the APA, duly notified the defendant of the default for its failure to timely make three of the installment payments, which notice was provided to the defendant more than 80 days ago.

14. Pursuant to Articles 2.2(c) and 9.3 of the APA, the entire balance of the deferred payment in the amount of $109,375.00 is now due and owing, plus as of October 25, 2019 late charges in the amount $3,125.04.

15. Article 9.6 of the APA provides that in any proceeding to enforce the terms of the agreement the prevailing party shall be awarded reasonable attorneys' fees in connection with such enforcement proceeding, which the plaintiff is hereby claiming in this proceeding.

16. Pursuant to Article 2.1(c) of the APA the defendant was to pay the plaintiff Beldotti Bakeries LLC the sum of $525,000.00 pursuant to a written promissory note adjusted and payable pursuant to Article 2.3 of the APA. Article 2.3 provided inter alia, that the note amount shall be paid in sixty monthly installments beginning 30 days after the closing that took place of July 31, 2018.

17. On or about July 31, 2018, pursuant to Articles 2.1(c) and 2.3 of the APA the

3

defendant executed a non-negotiable promissory note, whereby defendant promised to pay to the plaintiff Beldotti Bakeries LLC the sum of $525,000.00 pursuant to the conditions stated in Articles 2.1 and 2.3 of the APA, with interest at the rate of 6.0% per annum (the "$525,000.00 Note").

18. Plaintiff is the holder of the $525,000.00 Note.

19. Section 7 of the $525,000.00 Note provides that if the plaintiff Beldotti Bakeries LLC did not receive any payment within 10 days after the due date the defendant shall pay to said plaintiff a late charge equal to 5% of the overdue payment.

20. Section 8 of the $525,000.00 Note provides that should defendant fail to timely make three payments to the plaintiff Beldotti Bakeries LLC, than within eighty days after receipt of written notice by the defendant from the plaintiff that such monthly payment had not been received, then the defendant shall immediately pay the full amount of all unpaid principal, any and all accrued interest, and any other amounts due under the note, including all of plaintiff's costs of collection and reasonable attorney's fees.

21. The defendant made payments totaling $23,000 to the plaintiff Beldotti Bakeries LLC and failed to make any other payments that were justly due.

22. Pursuant to section 8 of the $525,000.00 Note, the plaintiff Beldotti Bakeries LLC on October 25, 2019 duly notified the defendant of its default for failing to timely make the three payments, which notice was more than 80 days ago.

23. Pursuant to section 8 of the $525,000.00 Note, the entire unpaid balance of principal in the amount of $502,500.00 is now due and payable as of this date, along with: (i) accrued interest in the amount of $53,248.78, with interest continuing hereafter, (ii) late charges of $4,500.00, and (iii) plaintiff's costs for collection, including

reasonable attorney's fees.

24. Despite due demand for payment the defendant has failed to pay the above amounts claimed due.

25. Article 5.7 of the APA provides with regard to "[s]olvency" that, "[p]urchaser is not entering into the Transaction with the intent to hinder, delay or defraud any person to which it is, or may become, indebted. Purchaser's assets, at a fair valuation, exceed its liabilities, and Purchaser is able, and will continue to be able after the Closing of the Transaction, to meet its debts as they mature, including but not limited to the Deferred Amount and the Note Amount, and will not become insolvent as a result of the Transaction. After the Closing of the Transaction, Purchaser will have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner."

26. Defendant knew at the time of making the above representations in Article 5.7 of the APA that Defendant was heavily in debt and that the defendant falsely and fraudulently for the purpose and intention of deceiving and defrauding the plaintiff, Beldotti Bakeries LLC failed to inform the plaintiff that it did not have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner, that its assets did not exceed its liabilities at a fair valuation and would not be able to after the closing to meets its debts as they mature including those to the plaintiff Beldotti Bakeries LLC and that it would not be solvent as a result of the APA.

27. The representations made in Article 5.7 by the defendant was made in order to induce the plaintiff Beldotti Bakeries LLC to enter into the APA in which the defendant received the plaintiff's wholesale bakery business doing business as Good Bread Bakery.

5

28. On the filing of defendant's schedules and bankruptcy pleadings which include the defendant's representations as to its history and why it filed bankruptcy plaintiff discovered that at the time the plaintiff entered into the APA with the defendant that the representations made by the defendant in Article 5.7 were falsely made with defendant's knowledge of their falsity and with intent to deceive.

29. That at the time the representations were made by the defendant in Article 5.7 of the APA, plaintiff Beldotti Bakeries LLC believed them to be true at the time they were made and relied upon them, and was thereby induced to enter into the APA and sell the above referenced assets to the defendant.

30. Had the plaintiff Beldotti Bakeries LLC known that the representations made by the defendant were false at the time they were made it would not have sold the assets to the defendant and entered into the APA.

## COUNT TWO: MICHAEL BELDOTTI

31. On or about July 31, 2018, the plaintiff Michael Beldotti and the defendant RM Bakery LLC entered into a written consulting agreement (hereinafter referred to as "the MB Consulting Agreement") attached as Exhibit D to the APA Exhibit 1 which is attached hereto, to assist in the transfer of the plaintiff Beldotti Bakeries LLC's wholesale bakery business doing business as Good Bread Bakery pursuant to the Asset Purchase Agreement.

32. The MB Consulting Agreement was for the term of one year at the rate of pay of $2,500.00 per month to be payable monthly in arrears on the fifth day of the month following the month it was earned.

33. Section 11 of the MB Consulting Agreement provides that in any proceeding to

6

enforce the terms of the MB Consulting Agreement the prevailing party shall be awarded reasonable attorneys' fees in connection with such enforcement proceeding, which the plaintiff is hereby claiming in this proceeding.

34. The defendant made four payments pursuant to the MB Consulting Agreement and failed to make the remaining eight payments which were due and payable for the consulting work done by the plaintiff Michael Beldotti pursuant to the MB Consulting Agreement.

35. Despite due demand for payment nothing has been paid on the above amounts due.

36. Article 5.7 of the APA provides with regard to "[s]olvency" that, "[p]urchaser is not entering into the Transaction with the intent to hinder, delay or defraud any person to which it is, or may become, indebted. Purchaser's assets, at a fair valuation, exceed its liabilities, and Purchaser is able, and will continue to be able after the Closing of the Transaction, to meet its debts as they mature, including but not limited to the Deferred Amount and the Note Amount, and will not become insolvent as a result of the Transaction. After the Closing of the Transaction, Purchaser will have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner."

37. Defendant knew at the time of making the above representations in Article 5.7 of the APA that Defendant was heavily in debt and that the defendant falsely and fraudulently for the purpose and intention of deceiving and defrauding the plaintiff Michael Beldotti failed to inform the plaintiff Michael Beldotti that it did not have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner, that its assets did not exceed its liabilities at a fair valuation and would not be to after the

7

closing to meets its debts as they mature including those to the plaintiff Michael Beldotti and that it would not be solvent as a result of the APA.

38. The representation made in Article 5.7 by the defendant was made in order to induce the plaintiff Michael Beldotti to enter into the MB Consulting Agreement in which the defendant received the plaintiff Beldotti Bakeries LLC's wholesale bakery business doing business as Good Bread Bakery.

39. On the filing of defendant's schedules and bankruptcy pleadings, which include the defendant's representations as to its history and why it filed bankruptcy, plaintiff Michael Beldotti discovered that the time the plaintiff entered into the MB Consulting Agreement with the defendant that the representations made in Article 5.7 were falsely made with defendant's knowledge of their falsity and intent to deceive.

40. That at the time the representations were made by the defendant in Article 5.7 of the APA, plaintiff Michael Beldotti believed them to be true at the time they were made and relied thereon, and was thereby induced to enter into the MB Consulting Agreement and assist in the transfer of the wholesale bakery business known as Good Bread Bakery from the plaintiff Beldotti Bakeries LLC to the defendant.

41. Had the plaintiff Michael Beldotti known that the representations made by the defendant were false at the time they were made he would not have entered into the MB Consulting Agreement and assist in the transfer of the wholesale bakery business known as Good Bread Bakery from the plaintiff Beldotti Bakeries LLC to the defendant.

## COUNT THREE: CHRISTOPHER BELDOTTI

42. On or about July 31, 2018, the plaintiff Christopher Beldotti and the defendant RM Bakery LLC entered into a written consulting agreement (hereinafter referred to as "the

CB Consulting Agreement") attached as Exhibit D to the APA Exhibit 1 which is attached hereto as Exhibit A to assist in the transfer of the plaintiff Beldotti Bakeries LLC's wholesale bakery business doing business as Good Bread Bakery pursuant to the Asset Purchase Agreement.

43.   The CB Consulting Agreement was for the term of one year at the rate of pay of $2,500.00 per month to be payable monthly in arrears on the fifth day of the month following the month it was earned.

44.   Section 11 of the CB Consulting Agreement provides that in any proceeding to enforce the terms of the CB Consulting Agreement the prevailing party shall be awarded reasonable attorneys' fees in connection with such enforcement proceeding, which the plaintiff is hereby claiming in this proceeding.

45.   The defendant made four payments pursuant to the CB Consulting Agreement and failed to make the remaining eight payments which were due and payable for the consulting work done by the plaintiff Christopher Beldotti pursuant to the CB Consulting Agreement.

46.   Despite due demand for payment nothing has been paid on the above amounts due.

47.   Article 5.7 of the APA provides with regard to "[s]olvency" that, "[p]urchaser is not entering into the Transaction with the intent to hinder, delay or defraud any person to which it is, or may become, indebted.  Purchaser's assets, at a fair valuation, exceed its liabilities, and Purchaser is able, and will continue to be able after the Closing of the Transaction, to meet its debts as they mature, including but not limited to the Deferred Amount and the Note Amount, and will not become insolvent as a result of the Transaction. After the Closing of the Transaction, Purchaser will have sufficient capital

and property to meet all of its obligations in the ordinary course and in an orderly manner."

48. Defendant knew at the time of making the above representations in Article 5.7 of the APA that Defendant was heavily in debt and that the defendant falsely and fraudulently for the purpose and intention of deceiving and defrauding the plaintiff Christopher Beldotti failed to inform the plaintiff Christopher Beldotti that it did not have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner, that its assets did not exceed its liabilities at a fair valuation and would not be able to after the closing to meets its debts as they mature including those to the plaintiff Christopher Beldotti and that it would not be solvent as a result of the APA.

49. The representation made in Article 5.7 by the defendant was made in order to induce the plaintiff Christopher Beldotti to enter into the CB Consulting Agreement in which the defendant received the plaintiff Beldotti Bakeries LLC's wholesale bakery business doing business as Good Bread Bakery.

50. On the filing of defendant's schedules and bankruptcy pleadings, which include the defendant's representations as to why its history and why it filed bankruptcy, plaintiff Christopher Beldotti discovered that at the time the plaintiff entered into the CB Consulting Agreement with the defendant that the representations made in Article 5.7 were falsely made with defendant's knowledge of their falsity and intent to deceive.

51. That at the time the representations were made by the defendant in Article 5.7 of the APA, plaintiff Christopher Beldotti believed them to be true at the time they were made and relied thereon, and was thereby induced to enter into the CB Consulting Agreement and assist in the transfer of the wholesale bakery business known as Good Bread Bakery

from the plaintiff Beldotti Bakeries LLC to the defendant.

52. Had the plaintiff Christopher Beldotti known that the representations made by the defendant were false at the time they were made he would not have entered into the CB Consulting Agreement and assist in the transfer of the wholesale bakery business known as Good Bread Bakery from the plaintiff Beldotti Bakeries LLC to the defendant.

WHERFORE, plaintiff respectfully prays for the following relief:

1. That Debtor RM Bakery be ordered to amend and supplement Debtor's schedules including but not limited to Official Form 204, Schedule A/B Assets part 11, Schedule E/F part 2, Schedule G so as to show the names, addresses, and dates when the indebtedness to the plaintiffs was incurred, and the correct amounts due all of Debtor's creditors including the plaintiffs.

2. That if the supplemental and amended petition be not received and filed in this Honorable Court on the day and date set by this Honorable Court, then plaintiffs pray that no discharge be granted to the Debtor RM Bakery LLC.

3. That Debtor be denied a discharge, particularly as to the above described debt of defendant to plaintiffs for reasons alleged in the above foregoing complaint

4. That the day and date be set for hearing on this objection to discharge.

5. Plaintiff prays for such other and further relief as to which this Court may deem to be just and proper and for such other and further orders and decrees necessary in the premises.

Dated: August 10, 2020

CREDITOR PLAINTIFFS,
BELDOTTI BAKERIES LLC, MICHAEL
BELDOTTI and CHRISTOPHER
BELDOTTI


BY  /s/ Andrew M. La Bella
ANDREW M. LA BELLA, ESQ.
100 WAVERLY ROAD
SCARSDALE, NEW YORK 10583
203-353-8346
FAX 203-353-8658
andrewlabella@yahoo.com
Counsel for the Creditor Plaintiffs

EXHIBIT 1

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of the 31st day of July, 2018 (the "Closing Date"), by and among **BELDOTTI BAKERIES LLC**, a Connecticut limited liability company (dba Good Bread Bakery) ("Seller"), **RM BAKERY LLC**, a Delaware limited liability company, or its affiliate or designee ("Purchaser"), and **MICHAEL BELDOTTI** ("MB") and **CHRISTOPHER BELDOTTI** ("CB" and together with MB, "Owners").

## R E C I T A L S:

**WHEREAS**, Seller operates a wholesale bakery business (the "Business") which services the Counties of the Bronx, Manhattan, Queens and Westchester all in the State of New York (the "Territory"); and

**WHEREAS**, Owners collectively own a one hundred percent (100%) equity interest in Seller; and

**WHEREAS**, based on the foregoing, Purchaser desires to purchase, and Seller desires to sell, assign and convey the Purchased Assets (as defined below) related to the Business pursuant to the terms and conditions set forth herein (the "Transaction"); and

**WHEREAS**, except as specifically provided herein, Purchaser is not assuming any of the Seller's liabilities and obligations, all of which shall remain the sole obligation of Seller.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual representations, warranties, covenants and promises contained herein, the adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1  SALE AND PURCHASE

**1.1** **Purchased Assets**. Subject to the terms and conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, convey, assign and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to and certain assets of the Business (other than the Excluded Assets) (the "Purchased Assets"), including, without limitation, the following:

(a)  All inventory (the "Inventory"), as listed on Schedule 1.1(a);

(b)  All equipment, machinery, tools, fixtures and replacement parts, as listed on Schedule 1.1(b) (the "Machinery and Equipment");

(c)  All rights in and to the means any and all of the following in any jurisdiction throughout the world: (i) all goodwill, logos, emblems, signs or insignis, trademarks and service marks, trade names, and similar rights, whether or not registered, including all applications and

1

registrations, (ii) copyrights, copyrightable subject matter, whether or not registered, including all applications and registrations related to the foregoing, (iii) all processes, testing procedures, devices, formulae, recipes, sketches, records, data and reports, designs, systems, quality control specifications, cost analysis, flow charts, process sheets, "know how," memoranda, customer lists, supplier lists, dealer personnel information, or other confidential information relation to financial, accounting and technical matters, and information relating to sales, financial structure, pricing and marketing data, personnel data, and similar operational records used in the Business, (iv) patents, patent applications as well as all reissues, divisionals, continuations and continuation-in-part applications and any patents issuing thereon, all license agreements, including the license to the design rights and patents, and other agreements which relate to inventions and discoveries and any patent applications and patents thereon, as well as improvements therein which are owned, licensed, used or held for use by Seller in respect of the Business, and (v) any and all other intellectual property used in the Business, as listed on Schedule 1.1(c)(the "Intellectual Property");

(d)     All rights in, to and under any and all contracts of the Business to which Seller is a party or may be bound or receive benefits in respect of the Business or by which the Purchased Assets may be affected (the "Business Contracts"), including all Business Contracts listed on Schedule 1.1(d);

(e)     All permits, licenses and government authorizations required to conduct the Business (the "Government Approvals"), including the Government Approvals listed on Schedule 1.1(e) to the extent assignable;

(f)     Copies of all documentation related to any of the Purchased Assets, on whatever medium and wherever located (the "Books and Records");

(g)     All work in-progress for the Business and all unfilled customer orders; and

(h)     All of the goodwill associated with the Purchased Assets and the Intellectual Property.

**1.2     Excluded Assets.**  Except for the Purchased Assets, all remaining assets of Seller (the "Excluded Assets") shall not be included in the Purchased Assets, including without limitation:

(a)     Cash, cash equivalents and marketable securities,

(b)     All accounts receivable through the Closing Date, and

(c)     All minutes of meetings of the board of directors, stockholders, partners or members of Seller, records relating to Taxes and files and other records which are not Purchased Assets.

**1.3     No Assumption of Liabilities.**  At the Closing, Purchaser will assume all liabilities and obligations relating to ownership or operation of the Purchased Assets or the Business that

2

either (a) are set forth in Schedule 1.3, or (b) arise after the Closing Date (collectively, the "Assumed Liabilities"). Except as specifically provided in the preceding sentence, Purchaser is not assuming any of the debts, obligations, liabilities or accounts payable of Seller, whether known, unknown, direct, indirect, asserted, unasserted, currently in existence, contingent or of any other nature, all of which shall remain the sole obligation of Seller, and shall be paid by Seller either at the Closing or in the ordinary course (collectively, the "Excluded Liabilities").

1.4    **Third Party Consents.** If any Business Contract or other Purchased Asset to be included among the Purchased Assets is not assignable or transferable to Purchaser as of the Closing Date (either by virtue of the provisions thereof or under applicable law) without the consent of some other party or parties, then the parties shall cooperate in good faith to seek such consents following the Closing Date. If such consents are not available, the parties intend that Purchaser nevertheless receive the economic and other benefits of, and perform the obligations under, such Business Contract or other Purchased Asset as if they had been assigned to Purchaser. The parties shall reasonably cooperate with one another in any reasonable arrangement designed to provide Purchaser the benefits of and obligations under such Business Contract or other Purchased Asset.

## ARTICLE 2    PURCHASE PRICE, CONVEYANCE AND PAYMENT

2.1    **Purchase Price.**  The aggregate purchase price for the Purchased Assets (the "Purchase Price") shall be equal to the sum of the following: (a) Three Hundred Ninety Thousand Dollars ($390,000.00) (the "Initial Payment"), plus (b) One Hundred Twenty-Five Thousand Dollars ($125,000.00) (the "Deferred Amount"), payable pursuant to Section 2.2 hereof, plus (c) Five Hundred Twenty-Five Thousand Dollars ($525,000.00) (the "Note Amount"), as adjusted and payable pursuant to Section 2.3 hereof. On the Closing Date, Purchaser shall deliver the Initial Payment to Seller by wire transfer in immediately available U.S. funds in accordance with the wire instructions as set forth on Exhibit A.

2.2    **Deferred Amount.** The Deferred Amount shall be paid in twenty-four (24) equal monthly installments, each in the amount of Five Thousand Two Hundred Eight and 33/100 Dollars ($5,208.33), beginning on the thirtieth (30th) day following the Closing Date. Purchaser shall have the right to prepay the Deferred Amount, or any portion thereof, at any time. If Seller has not received any payment within ten (10) days after the due date thereof, Purchaser shall pay to Seller a late charge equal to five percent (5%) of the overdue payment. In the event that (a) the Purchased Assets or substantially all of the Purchased Assets are re-sold by Purchaser to a non-affiliated third party, (b) there is a change in control of Purchaser, or (c) Purchaser fails to timely make three (3) payments required under this Section 2.2 within eighty (80) days after receipt of written notice from Seller that such monthly payment has not been received within the twenty-four (24) month term, then all remaining monthly installments of the Deferred Amount shall become immediately due and payable to Seller.

3

**2.3    Note Amount.**

(a)    The Note Amount shall be paid in sixty (60) monthly installments beginning on the thirtieth (30th) day following the Closing Date, (i) during the Offset Period, an amount equal to the Monthly Payment Amount,(ii) on the first day of the Remainder Period, the Accrued Interest for the Offset Period, provided that the Accrued Interest shall be reduced as if the original Note Amount was reduced by the First Annual Offset Period Decrease Amount and Second Annual Offset Period Decrease Amount, if any, as of the date of the Note,(iii) on the first anniversary of the Closing Date, the First Annual True-Up Amount, (iv) on second anniversary of the Closing Date, the Second Annual True-Up Amount, provided that the Offset Period has been extended pursuant to the proviso in the definition of Offset Period, and (v) during the Remainder Period, the Final Adjusted Monthly Note Payment Amount, plus the Accrued Interest in accordance with the terms of the promissory note attached hereto as Exhibit B (the "Note").

(b)    In addition, the Note Amount shall be reduced (i) on a monthly basis during the Offset Period, an amount equal to the Monthly Payment Amount, (ii) as of the date of the original date of the Note upon its calculation being finalized, the First Annual Offset Period Decrease Amount, if any, (iii) as of the date of the original date of the Note upon its calculation being finalized, the Second Annual Offset Period Decrease Amount, if any, (iv) on the first anniversary of the Closing Date and the second anniversary of the Closing Date provided the Offset Period has been extended pursuant to the definition of "Offset Period", the First Annual True-Up Amount and the Second Annual True-Up Amount, if any, respectively, and (v) on the first day of the Remainder Period, an amount equal to the Remainder Decrease Amount.

(c)    For purposes of this Section 2.3, the following terms and definitions shall apply:

(i)    "Accrued Interest" shall mean the accrued interest on the outstanding principal amount of the Note, calculated at the rate of six percent (6%) per annum based on a 365-day calendar year.

(ii)    "Affiliate Bakery" shall mean Seller's retail bakery located at 605 Newfield Avenue, Stamford, Connecticut 06905.

(iii)    "Existing Customers" shall mean the Seller's customers for the twelve (12) month period prior to the Closing Date as listed on Schedule 2.3(c)(iii), including, without limitation, the Affiliate Bakery.

(iv)    "Final Adjusted Monthly Note Payment Amount" shall mean an amount equal to the applicable Annual Percentage Decrease for the final twelve (12) months of the Offset Period *multiplied* by the applicable Monthly Payment Amount for the Remainder Period.

4

(v)     "First Annual Decrease Amount" shall mean an amount equal to $105,000, *multiplied by* the First Annual Percentage Decrease, provided that if the First Annual Percentage Decrease is zero the First Annual Decrease Amount shall be zero.

(vi)     "First Annual Percentage Decrease" for the first twelve (12) month period following the Closing Date an amount equal to (a) one (1) *less* (b) (I) the gross revenue collected by Purchaser from the Existing Customers and any new customers brought in by Seller and/or the Owners for such period, *divided by* (II) the Pre-Closing Annual Revenue Amount, provided that if the quotient calculated in (b) above is one or more the Percentage Decrease shall be zero.

(vii)     "First Annual True-Up Amount" shall mean an amount equal to the True-Up Amount *less* the First Annual Decrease Amount.

(viii)     "Maturity Date" shall mean the day immediately preceding the five (5) year anniversary of the Closing Date.

(ix)     "Monthly Payment Amount" shall mean (a) during the Offset Period, seven thousand five hundred fifty ($7,500.00), and (b) during the Remainder Period, an amount equal to (I) (1) the original Note Amount, *less* (2) the reductions contemplated by Section 2.3(b)(i), (ii), (iii) and (iv), and *divided by* (II) the number of months in the Remainder Period.

(x)     "Offset Period" shall mean the period beginning on the first day of the month immediately following the Closing Date and ending twelve (12) months thereafter; provided, however, if the First Annual Percentage Decrease exceeds ten percent (10%), then the Offset Period shall be extended for an additional twelve (12) months.

(xi)     "Pre-Closing Annual Revenue Amount" shall mean Two Million One Hundred Fifty Thousand Dollars ($2,150,000.00).

(xii)     "Remainder Decrease Amount" the sum of all of the Monthly Payment Amounts to be paid during the Remainder Period, *less* the sum of all of the Final Adjusted Monthly Note Payment Amounts to be paid during the Remainder Period.

(xiii)     "Remainder Period" shall mean the period beginning on the first day of the month immediately following the Offset Period and ending on the Maturity Date.

(xiv)     "Second Annual Decrease Amount" shall mean an amount equal to $105,000, *multiplied by* the Second Annual Percentage Decrease, provided that the Offset Period has been extended pursuant to the proviso set forth in the definition of "Offset Period" otherwise such amount shall be zero and further provided that if the Second Annual Percentage Decrease is zero the Second Annual Decrease Amount shall be zero.

(xv)     "Second Annual Percentage Decrease" for the first twelve (12) month period beginning on the thirteenth (13th) month following the Closing Date an amount equal

5

to (a) one (1) *less* (b) (I) the gross revenue collected by Purchaser from the Existing Customers and any new customers brought in by Seller and/or the Owners for such period, *divided by* (II) the Pre-Closing Annual Revenue Amount, *provided* that if the quotient calculated in (b) above is one or more the Percentage Decrease shall be zero.

(xvi)    "Second Annual True-Up Amount" shall mean an amount equal to the True-Up Amount *less* the Second Annual Decrease Amount, if any.

(xvii)    "True- Up Amount" shall mean fifteen thousand dollars ($15,000).

(c)    During the Offset Period, Seller and Owners shall be permitted to maintain relationships with the Existing Customers to the extent they deem necessary to minimize the impact of the payment reductions described herein. Purchaser agrees not to make any material changes to customers billing and service schedules during the Offset Period and shall use reasonable efforts to maintain the Existing Customers as Customers of Purchaser after the closing.

2.4    **Allocation**. The Purchase Price shall be allocated as set forth on Exhibit C, in accordance with Section the Internal 1060 of Revenue Code and the Treasury regulations thereunder (and any similar provision of state, local or foreign Law, as appropriate), which is attached hereto and incorporated herein by this specific reference (the "Allocation"). The parties shall be bound by the Allocation for all federal, state, and local income tax purposes; and shall report, act and file Tax Returns(including Internal Revenue Service Form 8594 (or other forms required by law) in accordance with the Allocation as set forth on Exhibit C, in all respects and for all purposes consistent with the Purchase Price Allocation and neither Purchaser nor Seller nor Owners shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with the Allocation as finally determined pursuant to this Section 2.4 unless required to do so by applicable law.

2.5    **Closing; Time and Place.** The "Closing" shall take place on the Closing Date remotely by facsimile or other electronic means as the parties hereto may agree. The consummation of the transactions contemplated under this Agreement (the "Closing") shall take place as of the date of this Agreement (the "Closing Date"), or by exchange of documents in escrow. The Closing shall be effective at 11:59pm EST on the Closing Date.

2.6    **Conveyance of Purchased Assets and Closing Deliveries**. On the Closing Date, Owners and Seller shall (a) take all steps reasonably necessary to place Purchaser in actual possession and operating control of the Purchased Assets, and (b) deliver the following items, duly executed by Owners and/or Seller, as applicable, all of which shall be in a form and substance reasonably acceptable to Purchaser and Purchaser's counsel:

(i)    A General Assignment and Bill of Sale and Assumption Agreement, duly executed by Seller;

(ii)    Any and all documents reasonably necessary to assign to Purchaser all of Seller's right, title and interest in and to the Intellectual Property;

6

(iii)    A Secretary's Certificate of Seller, dated as of the Closing Date, attaching (x) organizational documents, (y) resolutions of the members and managers of Seller authorizing this Agreement and the Transaction, and (z) certificates from the States of New York and Connecticut certifying as to Seller's good standing;

(iv)    A Certificate executed on behalf of Seller dated as of the Closing Date, certifying (x) that all of the representations and warranties of Seller and Owners in this Agreement shall have been true and correct in all material respects as of the Closing Date, (y) Seller and Owners shall have performed, in all material respects, all covenants and obligations in this Agreement required to be performed by Seller or Owners as of the Closing Date, and (z) to the extent required under applicable legal requirements, all Government Approvals shall have been obtained;

(v)    The Note, duly executed by Seller;

(vi)    The Consulting Agreement, duly executed by MB (the "MB Consulting Agreement"), in the form attached hereto as Exhibit D; and

(vii)    The Consulting Agreement, duly executed by CB (the "CB Consulting Agreement", and together with the MB Consulting Agreement, the "Consulting Agreements"), in the form attached hereto as Exhibit E.

2.7    **Deliveries by Purchaser**. On the Closing Date, Purchaser shall deliver the following items, duly executed by Purchaser as applicable, all of which shall be in a form and substance reasonably acceptable to Seller and Seller's counsel:

(a)    A wire transfer to Seller's designated account in the amount of the Initial Payment, as described in Section 2.1, less any bulk sale escrow amount required by New York, if any, contemplated by Section 5.5;

(b)    A Secretary's Certificate of Purchaser, dated as of the Closing Date, attaching (x) organizational documents, (y) attaching resolutions of the sole member of Purchaser authorizing this Agreement and the Transaction and (z) certificate from the State of Delaware certifying as to Purchaser's good standing;

(c)    A Certificate of Purchaser dated as of the Closing Date, certifying (i) that all of the representations and warranties of Purchaser in this Agreement shall have been true and correct in all material respects as of the Closing Date, (ii) Purchaser shall have performed, in all material respects, all covenants and obligations in this Agreement required to be performed by Purchaser as of the Closing Date;

(d)    The Note, duly executed by Purchaser; and

(e)    The Consulting Agreements, duly executed by Purchaser.

7

**2.8    Other Deliveries by Purchaser, Seller and Owners.**  On the Closing Date, Purchaser, Owners and Seller shall deliver such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise reasonably necessary or appropriate to transfer the Purchased Assets in accordance with the terms hereof and consummate the Transaction, and to vest in Purchaser and its successors and assigns full, complete, absolute, legal and equitable title to the Purchased Assets, free and clear of all liens, conditional sales agreements, security interests, pledges, encumbrances, covenants, conditions, claims, restrictions, equities, charges or mortgages to which Seller is a party (as Seller, obligor, or otherwise), including, but not limited to, tax liens or claims of the federal, state and/or local governmental entities or subdivisions or agencies thereof ("Encumbrances").

**2.9    Simultaneous Closing.**  The delivery of all documents and actions taken at the Closing shall all be considered parts of a simultaneous transaction and no delivery of documents or action taken shall be considered completed until all documents have been delivered and other actions taken.  Notwithstanding the above, Purchaser shall, at its sole cost and expense, have all Purchased Assets being acquired herein which are located at Seller's premises in Port Chester, New York removed to Purchaser's business location within three (3) days of the Closing.   The risk of loss for damage to any of the assets between the date of the Closing and the date actually removed by Purchaser shall be with Purchaser.

**2.10    Post-Closing Operations.**  Seller and Purchaser hereby agree that Seller shall continue to operate the business in the ordinary course of business through the Closing, including without limitation, baking all applicable goods and products on July 31, 2018. In addition, following the Closing, Seller shall deliver such goods and products to its customers on August 1, 2018. Purchaser shall reimburse Seller for all costs incurred by Seller in baking and delivering the goods and products to the customers.  Purchaser shall remit payment for the above costs within five (5) days of receipt of a written statement itemizing all costs incurred in connection with baking and delivery of such goods and products to the customers provided above.

### ARTICLE 3   REPRESENTATIONS AND WARRANTIES OF SELLER

Except as specifically set forth herein, Seller hereby represents and warrants to Purchaser on the Closing Date as follows:

**3.1    Organization, Good Standing, Qualification.**   Schedule 3.1 sets forth the jurisdiction of organization of Seller and each state or other jurisdiction in which Seller is qualified to do business.  Seller is (a) a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) is duly qualified to conduct business and is in good standing under the laws of each jurisdiction in which the nature of the Business, the operation of its assets or the ownership or leasing of the Purchased Assets requires such qualification, and (c) has full power and authority required to own, lease and operate the Purchased Assets and to carry on the Business.

**3.2    Authority of Seller.**  The execution, delivery and performance of this Agreement and all other agreements and documents executed by Seller, and the consummation of the

8

transactions contemplated hereby and thereby, have been duly authorized by all requisite action of Seller. The execution and delivery of this Agreement by Seller and all other agreements and documents executed by Seller, and the performance of its obligations hereunder and thereunder are not in conflict with or in violation or breach of any law, order, certificate of formation or operating agreement or any contract, agreement, loan agreement, bond, note or indenture, by which it or any of its properties are bound. This Agreement and all other agreements and documents executed by Seller have been duly executed and delivered by, and constitute the valid and binding obligations of, Seller. The execution and delivery of this Agreement and all other agreements and documents executed by Seller and the performance of its obligations hereunder and thereunder, will not result in the creation or imposition of any Encumbrances on any of the Purchased Assets.

3.3    **Enforceability**. This Agreement and all other agreements and documents executed by Seller hereunder have been duly executed and delivered by Seller and are valid and binding obligations of it enforceable against it in accordance with their respective terms.

3.4    **No Violation; Compliance with Laws**. None of the provisions of this Agreement, or any other documents related hereto violates any provision of any existing contract to which Seller is a party or will result in the violation of any law, rule, regulation or of any order or decree of any court or government instrumentality or the breach of any contract or other instrument to which Seller is a party or by which it or any of the Purchased Assets are bound, or require Seller to obtain or make any consent, authorization, approval, or filing under any law, judgment, decree or order of any court or governmental authority or of any other person. Seller is not in violation of any laws or governmental orders applicable to any Purchased Asset.

3.5    **Title; Encumbrances; Condition of Assets**. Seller has good and marketable title to (or in the case of any leased or licensed Purchased Asset, has a valid leasehold interest in or valid rights to use), is the exclusive legal and equitable owners of (or in the case of any leased or licensed Purchased Asset, is the valid licensee or valid lessee of) the Purchased Assets. The Purchased Assets are free and clear of all Encumbrances of any kind or nature. Upon Closing, Purchaser will acquire exclusive, good and marketable title to (or in the case of any leased or licensed Purchased Asset, will acquire a valid leasehold interest in or valid rights to use) the Purchased Assets. All Purchased Assets are (a) in operating condition and repair, in the ordinary course of business, subject to ordinary wear and tear, and (b) suitable and adequate for continued use in the manner in which they are presently being used.

3.6    **Financial Statements**.

(a)    Seller has delivered to Purchaser the following financial statements (collectively, the "Financial Statements"): (i) unaudited balance sheets, and the related statements of income and cash flows, of Seller for the three (3) fiscal years immediately preceding the Closing Date, together with the notes thereto, and (ii) unaudited balance sheets, and the related unaudited statements of income and cash flows, of Seller (the "Interim Balance Sheet") for the partial fiscal year ending on the Closing Date.

9

(b)    All of the Financial Statements are true, accurate and complete in all material respects and present fairly and accurately the financial condition of Seller as of the respective dates thereof and the results of income, changes in owners' equity and cash flows of Seller for the periods covered thereby; and were prepared in accordance with GAAP, applied on a consistent basis throughout the periods covered. All reserves established by Seller and set forth in the Interim Balance Sheet are adequate for the purposes for which they were established. Seller has no liabilities other than those set forth in the Interim Balance Sheet. During the twelve (12) month period immediately preceding the Closing Date, no material adverse change has occurred with respect to Seller, the Purchased Assets or the Business and no event or circumstance has occurred that could reasonably be expected to have a material adverse change on Seller, the Purchased Assets or the Business.

**3.7    Inventory**. Schedule 1.1(a) sets forth an accurate and complete list of the Inventory. All Inventory is (a) valued on the Financial Statements at original cost, (b) of good and merchantable quality, fit for the purpose for which they are intended, and saleable and useable in the ordinary course of business, and (c) free of material defects and damage.

**3.8    Machinery and Equipment**. Schedule 1.1(b) sets forth an accurate and complete list of the Machinery and Equipment. Except as described on Schedule 1.1(b), all of the Machinery and Equipment is (a) useable in the ordinary course of business, and (b) free of material defects and damage.

**3.9    Intellectual Property**.

(a)    Schedule 1.1(c) lists all Intellectual Property, specifying in each case whether such Intellectual Property is owned or controlled by or for, licensed to, or otherwise held by or for the benefit of Seller, including all Intellectual Property rights owned by, filed in the name of or applied for by Seller and used in the Business. Each item of Intellectual Property (i) is valid, subsisting and in full force and effect, (ii) has not been abandoned or passed into the public domain, and (iii) is free and clear of any Encumbrances. The Intellectual Property constitutes all the Intellectual Property rights used in and/or necessary to the conduct of the Business as it is currently conducted.

(b)    Each item of Intellectual Property either (i) is exclusively owned by Seller and was written and created solely by employees of Seller acting within the scope of their employment or by third parties, all of which employees and third parties have validly and irrevocably assigned all of their rights, including Intellectual Property rights therein, to Seller, and no third party owns or has any rights to any such Intellectual Property, or (ii) is duly and validly licensed to Seller. Seller has not transferred ownership of, or granted any exclusive license to use any Intellectual Property to any person. Seller has no knowledge of any material violation or unauthorized disclosure of any trade secret or Confidential Information related to the Business, the Purchased Assets or obligations of confidentiality with respect to such. To Seller's knowledge and belief, the operation of the Business as it is currently conducted, does not infringe or misappropriate any Intellectual Property rights of any person, and neither Seller nor Owners have

10

received notice from any person claiming such infringement (nor does Seller have knowledge of any basis therefor).

### 3.10 Business Contracts.

(a) Schedule 1.1(d) sets forth an accurate and complete list of all Business Contracts as of the Closing Date. With respect to any and all oral agreements or understandings, Seller has provided Purchaser with written summaries of the material terms of each such oral agreement or understanding which are set forth on Schedule 1.1(d).

(b) Each Business Contract is currently valid and in full force and effect, and is enforceable by Seller in accordance with its terms. Seller has not waived any of its rights under any Business Contract. Seller is not in material default, and no party has notified Seller or Owners that Seller is in material default, under any Business Contract. No event has occurred, and no circumstance or condition exists, that might (with or without notice or lapse of time) (i) result in a material violation or material breach of any of the provisions of any Business Contract, (ii) give any person the right to declare a material default or exercise any remedy under any Business Contract, or (iii) give any person the right to accelerate the maturity or performance of any Business Contract or to cancel, terminate or modify any Business Contract.

### 3.11 Government Approvals. Seller has all Government Approvals that are necessary or appropriate in connection with Seller's operation of the Business. Schedule 1.1(e) contains an accurate and complete list and summary description of each such Government Approval. Each such Government Approval is valid and in full force and effect, and there is not pending or threatened in writing any proceeding which could result in the suspension, termination, revocation, cancellation, limitation or impairment of any such Government Approval. No fines or penalties are due and payable in respect of any Government Approval or any violation thereof.

### 3.12 No Litigation. There is no pending litigation, action, suit, proceeding, claim or investigation, at law or in equity, against or affecting Seller, before any court, authority, agency or arbitrator which relates to any of the Purchased Assets or the Business, or to the execution or delivery of, or the consummation of the transactions contemplated by, this Agreement.

### 3.13 Insurance. Schedule 3.13 sets forth an accurate and complete list of all insurance policies, self-insurance arrangements and fidelity bonds, currently in effect, that insure Seller, the Business and/or the Purchased Assets (collectively, the "Insurance Policies"). Each Insurance Policy is valid, binding, and in full force and effect and shall be in full force and effect as of the Closing Date. Seller has not received any notice of cancellation or non-renewal of any Insurance Policy that would adversely and materially affect the Business or the Purchased Assets. Schedule 3.13 sets forth an accurate and complete list of all claims filed by Seller, or intended to be filed by Seller, against the Insurance Policies in the past thirty-six (36) months.

11

### 3.14    Customers and Suppliers.

(a)    Schedule 2.3(c)(iii) contains an accurate and complete list of each of Seller's Existing Customers and the gross revenue collected by Seller from the Existing Customers during the twelve (12) months immediately preceding the Closing Date.

(b)    Schedule 3.14(b) contains an accurate and complete list of each of Seller's suppliers as of the Closing Date and the amount paid by Seller during the twelve (12) months immediately preceding the Closing Date.

(c)    Seller has not entered into any contract under which Seller is restricted from operating the Business or selling any Inventory to any class of customers, in any geographic area, during any period of time or in any segment of the market.

(d)    Seller has not received any notice or other communication, or received any other information indicating, and otherwise has no knowledge, that any current customer or supplier identified herein intends to cease dealing with Seller, may otherwise reduce the volume of business transacted by such person with Seller or otherwise is dissatisfied with the service that Seller provides to such person.  Seller has no reason to believe that any such person will cease to do business with Purchaser after, or as a result of, consummation of the Transaction. Seller has no knowledge of any fact, condition or event which, by itself or in the aggregate, has adversely affected its relationship with any such person.

(e)    Seller has not, directly or indirectly, given or agreed to give any rebate, gift or similar benefit to any customer, supplier, distributor, broker, governmental employee or other person, who was, is or may be in a position to help or hinder the Business (or assist in connection with any actual or proposed transaction) which could subject them to any damage or penalty in any civil, criminal or governmental litigation or proceeding.

### 3.15    Employees and Consultants.

(a)    Schedule 3.15(a) sets forth an accurate and complete list of all (i) employees that provide services to the Business, including each employee's name, title or position (including a designation for each key management employee), present annual compensation (including bonuses, commissions and deferred compensation), accrued and unused paid vacation and other paid leave, years of service, interests in any incentive compensation plan, and estimated entitlements to receive supplementary retirement benefits or allowances, and (ii) individuals who are currently performing services for the Business who are classified as "consultants" or "independent contractors," including the respective compensation of each consultant or independent contractor.  Neither the consummation of this Transaction nor any termination of the employment of any of the employees will result in or give rise to (1) any obligation to make any severance, retention, termination, change of control, "golden parachute," or other payments to any present or former employee, or (2) the acceleration of any other rights or benefits to any present or former employee, whether pursuant to an oral or written agreement or understanding, statute, or otherwise.

12

(b)     There are no claims pending threatened in writing involving any employee, consultant or independent contractor performing work for Seller prior to the Closing Date. Seller has not suffered or sustained any work stoppage and to Seller's knowledge no such work stoppage is threatened. Seller has no collective bargaining agreements with any employees. There has not been and is no labor union organizing or election activity pending or threatened with respect to Seller or the Business, nor to Seller's knowledge does any condition or circumstance exist, that likely would directly or indirectly give rise to or provide a basis for the commencement of any such activity.

(c)     Seller has complied with all legal requirements related to the employment of its present and former employees, including provisions related to wages, hours, leaves of absence, equal opportunity, occupational health and safety, workers' compensation, severance, employee handbooks or manuals, and the payment of social security and other taxes. No employee, consultant or independent contractor, or other service provider who is a party to any proprietary information, confidentiality, non-competition, employment or similar agreement with any third party is or has been alleged to have been or be in breach of such agreement. Seller has no liability under any legal requirements related to employment and attributable to an event occurring or a state of facts existing prior to the Closing Date.

**3.16     Benefit Plans.** Schedule 3.16 sets forth an accurate and complete list of (a) all "employee benefit plans" within the meaning of Section 3(3) of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and (b) all other employee benefit arrangements offered by Seller to its employees (the "Benefit Plans"). Each Benefit Plan complies by its terms and in operation with the requirements provided by any and all statutes, orders or governmental rules and regulations currently in effect and applicable to the Benefit Plan, including ERISA and the Internal Revenue Code. The consummation of the Transaction will not conflict with or result in any material violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation, modification or acceleration of any obligation or loss of any benefit under any Benefit Plan, trust or loan that will or may result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any employee, or any other material liability for Seller.

**3.17     Compliance with Laws.** Seller has conducted, and is conducting the Business, and at all times within the last three (3) years has been, in compliance in all material respects, with all legal requirements that is applicable to the Business and the Purchased Assets, and no event or act or omission has occurred, and no condition or circumstance exists, that might (with or without notice or lapse of time) constitute, or result directly or indirectly in, a material default under, a material breach or violation of, or a material failure to comply with, any such legal requirement. Neither Seller nor Owners have received any notice from any third party regarding any actual, alleged or potential violation of any legal requirement.

**3.18     Environmental Matters.** Seller is in compliance with all environmental and safety laws, including possessing all Government Approvals, if any. The Purchased Assets meet all

13

applicable standards under all environmental and safety laws for the purposes of conducting the Business as currently conducted. With respect to any real property currently or formerly leased by Seller, or any property leased by any person to whom Seller has leased any of the Purchased Assets, there have been no releases of hazardous materials that are reasonably likely to result in a claim against Seller.

**3.19   Taxes**.

(a)     Seller has delivered to Purchaser copies of Seller's federal and state tax returns for the past three (3) calendar years. Seller has timely filed or received extensions with respect to all tax returns that Seller was required to file, and such tax returns are accurate and complete in all respects. Seller has no liability for any amounts due to any bulk sale division in connection with the execution of this Agreement and the consummation of the Transaction. Seller is deemed a "partnership" for federal and state tax purposes.

(b)     For the past five (5) Seller has not paid or is responsible to pay any state sales tax to the State of Connecticut with respect to the Business. In addition, Seller has not consummated any sales in the State of Connecticut that would require or obligate Seller to pay any such state sales taxes.

**3.20   Indebtedness**.   Seller does not have any liability, obligation or indebtedness, whether known or unknown, accrued, contingent or otherwise relating to the Purchased Assets.

**3.21   Brokers**. Except for Jay M. Inbar of Inbar Group, Inc., Seller has not retained any broker or finder or incurred any liability or obligation for any brokerage fees, taxes commissions or finders fees with respect to this Agreement or the Transaction.

**3.22   Solvency**. Seller is not entering into the Transaction with the intent to hinder, delay or defraud any person to which it is, or may become, indebted. Seller's assets, at a fair valuation, exceed its liabilities, and Seller is able, and will continue to be able after the Closing of the Transaction, to meet its debts as they mature and will not become insolvent as a result of the Transaction. After the Closing of the Transaction, Seller will have sufficient capital and property remaining to wind down its operations in an orderly manner.

**3.23   Ownership**.   Owners collectively own a one hundred percent (100%) of the outstanding equity interest of Seller.

**3.24   Full Disclosure**.   Neither this Agreement nor any other agreement, document or written statement made by Seller and furnished by Seller to Purchaser in connection with the transactions contemplated hereby, (a) contain as of the Closing Date any untrue statement of fact or (b) omits to state any material fact necessary to make any of the representations, warranties or other statements or information contained herein or therein (in light of the circumstances under which they were made) not misleading.

14

## ARTICLE 4  REPRESENTATIONS AND WARRANTIES OF OWNERS

The Owners, jointly and severally, hereby represent and warrant to Purchaser that:

**4.1    Owners' Representations and Warranties.**  The representations and warranties made by Seller in Article 3 are true and correct in all respects to the knowledge of the Owners.

## ARTICLE 5  REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as specifically set forth herein, Purchaser hereby represents and warrants as of the Closing Date to Seller and Owners as follows:

**5.1    Organization and Good Standing.**  Purchaser (a) is a limited liability duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) is duly qualified to conduct business and is, or shall be at the time of the Closing, in good standing under the laws of each jurisdiction in which the nature of the Business, the operation of its assets or the ownership or leasing of the Purchased Assets requires such qualification, and (c) has full power and authority required to acquire, own, lease and operate the Purchased Assets and to carry on the Business after the Closing.

**5.2    Authority; Binding Nature of Agreements.**  Purchaser has all requisite power and authority to execute and deliver this Agreement.  The execution, delivery and performance by Purchaser of this Agreement has been approved by all requisite action on the part of Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser.  This Agreement constitutes, or upon execution and delivery, will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

**5.3    Enforceability.**  This Agreement and all other agreements and documents executed by Purchaser hereunder have been duly executed and delivered by Purchaser and are valid and binding obligations of it enforceable against it in accordance with their respective terms.

**5.4    No Litigation.**  There is no pending litigation, action, suit, proceeding, claim or investigation, at law or in equity, against or affecting Purchaser, before any court, authority, agency or arbitrator which relates to any of the Purchased Assets or the Business, or to the execution or delivery of, or the consummation of the transactions contemplated by, this Agreement.

**5.5    Bulk Sales.**  Purchaser has filed and recorded a Notification of Sale, Transfer, or Assignment in Bulk (AU-196.10) with the New York Department of Taxation.

**5.6    Brokers.**  Purchaser has neither utilized nor retained any broker or finder or incurred any liability or obligation for any brokerage fees, taxes commissions or finders fees with respect to this Agreement or the Transaction.

**5.7    Solvency.**  Purchaser is not entering into the Transaction with the intent to hinder, delay or defraud any person to which it is, or may become, indebted.  Purchaser's assets, at a fair

15

valuation, exceed its liabilities, and Purchaser is able, and will continue to be able after the Closing of the Transaction, to meet its debts as they mature, including but not limited to the Deferred Amount and the Note Amount, and will not become insolvent as a result of the Transaction. After the Closing of the Transaction, Purchaser will have sufficient capital and property to meet all of its obligations in the ordinary course and in an orderly manner.

## ARTICLE 6  COVENANTS

**6.1  Further Assurances.** Each party agrees (a) to furnish upon request to each other party such further information, (b) to execute and deliver to each other party such other documents, and (c) to do such other things, all as another party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

**6.2  Use of Name.** Promptly following the Closing, Seller shall (a) amend its organizational documents and take such other actions reasonably necessary to change its name to remove reference to "Good Bread Bakery" and (b) take all actions reasonably requested by Purchaser to enable Purchaser to use any trade names acquired by Purchaser at the Closing. From and after the Closing, neither Seller, Owner nor any of their respective affiliates shall, directly or indirectly, make any further use of the name "Good Bread Bakery" or any other name that is sufficiently similar in sound or appearance to "Good Bread Bakery" so as to potentially cause confusion.

**6.3  Bulk Sale Requirements.** The parties hereto agree to waive any bulk sales (tax clearance) compliance in the State of Connecticut.

**6.4  Records and Documents.** For a period of three (3) years after the Closing, at a party's request, Purchaser on the one hand, and Owners and Seller on the other hand, shall provide one another with reasonable access to and the right to make copies of those records and documents related to the operation of the Business prior to Closing. If during such period either party elects to dispose of such records and documents, it shall give the other party no less than sixty (60) days' prior written notice, during which period such party shall have the right to take such records and documents without further consideration.

**6.5  Non-Competition; Non-Solicitation.**

(a)  For and in consideration of the Transaction contemplated herein and as an inducement for Purchaser to enter into this Agreement, Seller and Owners, hereby jointly and severally agree that during the period commencing on the Closing Date and ending on the five (5) year anniversary of the Closing Date (the "Restricted Period"), neither Seller, nor Owners shall, directly or indirectly, do any of the following:

(i)  except as contemplated by the Consulting Agreements, solicit or attempt to solicit, either directly or indirectly, any former or existing customer of Seller (including, without limitation, the Existing Customers);

16

(ii)     induce or attempt to influence any employee, customer or supplier of Seller or Purchaser (including those customers and suppliers identified in the customer and supplier set forth on <u>Schedule 3.14</u>) to terminate his, her or its relationship with Purchaser;

(iii)     solicit or interfere with, or attempt to solicit or interfere with, either directly or indirectly, any contractual arrangement of Seller  (including the Business Contracts purchased hereunder);

(iv)     induce or attempt to influence any entity or person with a business or professional relationship which was transferred by Seller to Purchaser to terminate that relationship;

(v)     solicit or interfere with, or attempt to solicit or interfere with, either directly or indirectly, any other relationship not contemplated above which Purchaser has with any other person, provided that Seller may solicit any such other relationship whether or not located in the Territory for the sole purpose of doing business in the State of Connecticut.

(b)     Seller and Owners, hereby jointly and severally acknowledge that Purchaser's customer and supplier lists(including the customer and supplier lists purchased hereunder) are a valuable, special and unique asset of Purchaser and, as such, are proprietary in nature. Therefore, Seller and Owners, hereby jointly and severally agree that, during the Restricted Period in the Territory, neither Seller nor Owners shall use such customer and supplier lists, or any part thereof, for their own benefit, or for the benefit of any other person or entity in the Territory, and shall not disclose the information contained therein to any person or entity for any reason except as contemplated by the Consulting Agreements.

(c)     Except as contemplated by the Consulting Agreements, during the Restricted Period, neither Seller nor Owners shall directly or indirectly, in any capacity, within the Territory (as defined in the Recitals), (i) engage in the Business as conducted on the Closing Date, (ii) have any ownership interest in any entity engaged in the Business, other than a 5% or less interest as an investor only, or (iii) perform any services for, any person, directly or indirectly, that is engaged in the Business.

(d)     It is the understanding of the parties that the scope of the covenants contained in this <u>Section 6.5</u>, both as to time and area covered, are necessary to protect the rights of Purchaser and the goodwill that is a part of the Business to be acquired by Purchaser.  It is the parties' intention that these covenants be enforced to the greatest extent (but to no greater extent) in time, area, and degree of participation as is permitted by the law of that jurisdiction whose law is found to be applicable to any acts in breach of these covenants.  It being the purpose of this Agreement to govern competition by Seller and Owners, these covenants shall be governed by and construed according to that law (from among those jurisdictions arguably applicable to this Agreement and those in which a breach of this Agreement is alleged to have occurred or to be threatened) which best gives them effect.  The prohibitions in each of subsections (a)-(c) in <u>Section 6.4</u> above shall be deemed, and shall be construed as separate and independent agreements between

17

Purchaser on the one hand, and Seller and Owners, on the other. If any such agreement or any part of such agreement is held invalid, void or unenforceable by any court of competent jurisdiction, such invalidity, voidness, or unenforceability shall in no way render invalid, void, or unenforceable any other part of them or any separate agreement not declared invalid, void or unenforceable; and this Agreement shall in such case be construed as if the invalid, void, or unenforceable provisions were omitted.

(e)     The parties agree that the covenants of Seller and Owners not to compete or solicit contained in this Section 6.5 may be assigned by Purchaser to any person to whom the Business may be transferred. It is the parties' intention that these covenants of Seller and Owners shall inure to the benefit of any person that may succeed to the Business and Purchased Assets with the same force and effect as if these covenants were made directly with such successor.

(f)     The parties agree that, in the event of a material breach or threatened material breach of Seller's or Owners' covenants in this Section 6.5, the damage or imminent damage to the value and the goodwill of Purchaser and the Business may be irreparable and extremely difficult to estimate, making any remedy at law or in damages inadequate. Accordingly, the parties agree that Purchaser shall be entitled to injunctive relief (without any need to post any bond) against Seller and Owners in the event of any breach or threatened breach of any of such covenants by Seller or Owners, in addition to any other relief (including damages) available to Purchaser under this Agreement or under applicable legal requirements.

**6.6     Nondisclosure.** Each of Seller and Owners recognizes and acknowledges that Seller and Owners have had in the past, currently have, and in the future may possibly have, access to certain Confidential Information, as defined below, that is a valuable, special and unique asset of the Business. Seller and Owners agree that from and after the Closing, Seller and Owners shall not disclose such Confidential Information to any person, for any purpose or reason whatsoever during the term of this Agreement, except (a) to authorized representatives of Purchaser, or (b) to counsel and other advisers to Seller, provided that such advisers agree to the confidentiality provisions of this Section 6.6. "Confidential Information" shall mean all trade secrets and other confidential and/or proprietary information of a person, including information derived from reports, investigations, research, work in progress, codes, marketing and sales programs, recipes, know-how, customer and supplier lists, financial projections, cost summaries, pricing formula, contract analyses, financial information, projections, confidential filings with any state or federal agency, and all other confidential concepts, methods of doing business, ideas, materials or information prepared or performed for, by or on behalf of such person by its employees, officers, directors, agents, representatives, or consultants. Information shall not be deemed Confidential Information hereunder if: (i) such information becomes available to or known by the public generally through no fault of the party required to maintain such information as confidential, or (ii) disclosure is required by law or the order of any governmental authority under color of law, provided, however, that prior to disclosing any information pursuant to this clause (ii), Seller or Owners shall, if possible, give prior written notice thereof to Purchaser and, at Purchaser's election, either provide Purchaser with the opportunity to contest such disclosure or seek to obtain a protective order narrowing the scope of such disclosure and/or use of the Confidential Information. Nothing herein

18

shall be construed as prohibiting Purchaser from pursuing any other available remedy for such breach or threatened breach, including the recovery of damages.

### 6.7   Accounts Receivable.

(a)   After the Closing any payments received by Purchaser for accounts receivables owed to Seller shall be handled in the following manner; (i) payments received that are solely for accounts receivables invoices owed to Seller shall be immediately (not more than three (3) days) forwarded to Seller or deposited to an account requested by Seller; (ii) payments received by Purchaser which cover accounts receivable invoices owed to both Seller and Purchaser shall be deposited by Purchaser to its account, provided that within one (1) week of receiving such payment, Purchaser shall remit payment to Seller for the portion that such payment relates to accounts receivable invoices owed to Seller; and (iii) payments received by Purchaser that are solely for accounts receivables invoices owed to Purchaser shall be deposited to its account (this provision shall survive the Closing).

(b)   From and after the Closing Date, on a periodic basis but no less than weekly, Seller shall delivery to Purchaser by email, a copy of any payments received by Seller showing any and all activity made in order for Purchaser to track all customer payments that have been made through ACH or other form of deposit or payments with respect to sales of the Business made prior to the Closing Date or after the Closing Date as contemplated by Section 2.10.

(c)   From and after the Closing Date, on a weekly basis, Purchaser shall delivery to Seller by email, a copy of any payments received with respect to sales of the Business made prior to the Closing Date.

### 6.8   Subordination.

(a)   Seller and Owners acknowledge and agree that the Deferred Amount and the Note Amount are junior unsecured subordinated indebtedness ("Subordinated Indebtedness") to Purchaser's existing senior secured lenders ("Senior Indebtedness"). As such any payments with respect to the Subordinated Indebtedness is and shall be expressly junior and subordinated in right of payment to all amounts due and owing upon all Senior Indebtedness outstanding from time to time to the extent and on the terms and conditions set forth herein. So long as no event of default (as expressly set forth in the agreements relating to the Senior Indebtedness) shall have occurred and be continuing under any of the agreements relating to the Senior Indebtedness beyond any applicable notice and cure period, Purchaser shall pay and the holder of the Subordinated Indebtedness shall receive and retain regularly scheduled payments on the Subordinated Indebtedness as set forth in this Agreement and the Note.  Following the occurrence and continuation of any event of any event of default, after any applicable notice and cure period under any such agreements relating to the Senior Indebtedness and receipt of written notice by Seller and copies of any notices received by Purchaser of its restriction to make any payments on the Subordinated Indebtedness, Purchaser shall suspend making any payments on the Subordinated Indebtedness.  Once such event of default has been cured, Purchaser shall immediately pay all outstanding payments under this Agreement and the Note that were suspended and shall resume

19

making all payments to the holders of Subordinated Indebtedness under this Agreement and the Note.

(b)     Following the Closing Date, in the event that the holders of Senior Indebtedness request that the parties hereto enter into a subordination agreement by and among the parties hereto and the holders of the Senior Indebtedness, the parties hereto agree to use commercially reasonable efforts to negotiate and enter into a customary subordination agreement by and among all such parties within thirty (30) days of such request.

**6.9     First County Bank.** Following the Closing Date, but in no event more than fifteen (15) days thereafter, Seller and Owners will cause First County Bank to amend the following UCC-1s on file in the State of Connecticut to remove the Purchased Assets: (a) UCC #0002868798, dated April 11, 2012, and (b) UCC #0003228683, dated February 27, 2018.

## ARTICLE 7  EMPLOYEES

**7.1     Transferred Employees.** Purchaser may, but shall have no obligation to, offer employment to some or all of Seller's employees. Seller shall terminate the employment, to be effective immediately prior to the Closing, of the employees set forth on Schedule 7.1(each a "Transferred Employee"). The parties acknowledge and agree that it is not the intention of the parties that any contracts of employment shall be assumed by Purchaser as a result of the Transaction. Seller shall be liable for any and all liabilities associated with the termination of the Transferred Employees, if any, and shall indemnify Purchaser for all such liabilities, including, without limitation, severance, expenses owed, compensation, bonuses, and health benefits.

**7.2     Post-Closing Employee Benefits.** The post-closing employee benefits for each of the Transferred Employees and their respective beneficiaries and dependents shall be determined at the sole discretion of Purchaser. The parties shall reasonably cooperate, both before and after the Closing Date, to (a) exchange information related to the Transferred Employees, including employment records, benefits information, and financial statements and (b) take any other actions with respect to the Transferred Employees and their respective beneficiaries and dependents. Seller shall retain responsibility for providing health care continuation coverage under any one or more of its group health plans as required by the Code and applicable Treasury Regulations.

**7.3     Compliance with Legal Requirements and Other Obligations.** Prior to the Closing, at their sole cost and expense, Owners and Seller shall take all actions reasonably necessary to comply with all appropriate legal requirements in connection with Seller's employment of the employees. Seller shall be solely responsible, before and after the Closing, for the payment of any amounts required to be paid under any legal requirement as a result of the termination or layoff of any employee who is not a Transferred Employee. Prior to the Closing, Seller shall perform all of Seller's contractual and other obligations in connection with the employment of the employees.

**7.4     No Benefit to Employees Intended.** This Article 7 is not intended to, and does not, create any rights or obligations to or for the benefit of anyone other than the parties. In addition,

20

this Article 7 does not provide for any guaranteed employment to any current or former employee of Seller, including, without limitation, the Transferred Employees.

## ARTICLE 8  INDEMNIFICATION

**8.1    Survival of Representations and Warranties.**  All representations and warranties of Seller, Owners or Purchaser in this Agreement shall survive the Closing and shall continue to survive thereafter until the two (2) year anniversary of the Closing Date (the "Survival Date"); provided, however, that (a) all representations and warranties relating to taxes shall survive until thirty (30) calendar days after expiration of all applicable statutes of limitations relating to such taxes; and (b) any claim for indemnification based upon a breach of any such representation or warranty and asserted prior to the applicable Survival Date by written notice in accordance with Section 8.4 shall survive until final resolution of such claim. The representations and warranties contained in this Agreement (and any right to indemnification for breach thereof) shall not be affected by any investigation, verification or examination by any party hereto or by any representative of any such party or by any such party's knowledge of any facts with respect to the accuracy or inaccuracy of any such representation or warranty. Claims for indemnification under this Article 8 for breaches of representations and warranties must be made within the time period set forth in this Section 8.1 (excluding for these purposes claims for fraud or intentional misrepresentation, and claims for breaches of covenants or agreements).

**8.2    Indemnification by Seller and Owners.**  Seller and Owners shall jointly and severally indemnify, defend and hold harmless Purchaser and its representatives from and against any and all claims, losses, costs, expenses, damages, deficiencies, diminution in value, liabilities and expenses, including reasonable attorneys' fees, and expenses of investigation and defense ("Damages"), whether or not involving a third-party claim, arising out of, relating to or resulting from (a) any breach of a representation or warranty of Seller or Owners contained in this Agreement or any other agreement entered into in connection with this Agreement, (b) any breach of or failure to perform any covenant of Seller or Owners contained in this Agreement or any other agreement entered into in connection with this Agreement, (c) any Excluded Assets or Excluded Liabilities, or (d) any liability of Seller or Owners arising out of the ownership or operation of the Purchased Assets, the Business, or the business of any of Seller's affiliates prior to the Closing.

**8.3    Indemnification by Purchaser.**  Purchaser shall indemnify, defend and hold harmless Seller and the Owners and its respective representatives from and against any and all Damages, whether or not involving a third-party claim, including reasonable attorneys' fees, arising out of, relating to or resulting from (a) any breach of a representation or warranty of Purchaser contained in this Agreement or any other agreement entered into in connection with this Agreement, (b) any breach of or failure to perform any covenant of Purchaser contained in this Agreement or any other agreement entered into in connection with this Agreement, or (c) any Assumed Liabilities.

**8.4    Defense of Claim.**  In case any party entitled to indemnification under this Article VIII (the "Indemnified Party") has received actual notice of any claim asserted or any action or administrative or other proceeding commenced in respect of which claim, action or proceeding

21

indemnity properly may be sought against the other party (the "Indemnifying Party") pursuant to this Agreement, the Indemnified Party will give notice in writing to the Indemnifying Party. Within ten (10) days after receipt of such notice, the Indemnifying Party may give the Indemnified Party written notice of his election to conduct the defense of such claim, action, or proceeding at its own expense. If the Indemnifying Party has given Indemnified Party such notice of election to conduct the defense, the Indemnifying Party may conduct the defense at its expense, but the Indemnified Party will nevertheless have the right to participate in the defense, provided that such participation will be solely at the expense of the Indemnified Party, without a right of further reimbursement. If the Indemnifying Party has not so notified Indemnified Party in writing (within the time above provided) of his election to conduct the defense of such claim, action, or proceeding, the Indemnified Party may (but need not) conduct (at the Indemnifying Party's expense) the defense of such claim, action, or proceeding.  The Indemnified Party may at any time notify the Indemnifying Party of the Indemnified Party's intention to settle, compromise or satisfy any such claim, action or proceeding (the defense of which the Indemnifying Party has not previously elected to conduct) and may make such settlement, compromise or satisfaction (at the Indemnifying Party's expense) unless Indemnifying Party notifies the Indemnified Party in writing (within twenty (20) days (or such shorter period of time if required by the terms of the proposed settlement, but in no event less than five (5) days) after receipt of such notice of intention to settle, compromise or satisfy) of his election to assume (at its sole expense) the defense of any such claim, action or proceeding and promptly take appropriate action to implement such defense. If the Indemnifying Party has elected under this Section 8.4 to conduct the defense of any claim, action or proceeding, then Indemnifying Party will be obligated to pay the amount of any adverse final judgment or decree rendered with respect to such claim, action or proceeding subject to the terms of this Agreement. Notwithstanding the foregoing, neither Indemnified Party nor Indemnifying Party shall settle or compromise any claim, action or proceeding over the objection of the other; _provided, however_, that consent to settlement or compromise shall not be unreasonably withheld or delayed. Indemnified Party and Indemnifying Party will use all reasonable efforts to cooperate fully with respect to the defense of any claim, action or proceeding covered by this Section 8.4. The failure of any Party to notify the other Party shall not relieve the Party receiving notice of its obligations hereunder except in the event, and solely to the extent that the failure to so notify materially adversely prejudices the ability of the Party receiving notice to defend any claim, action or proceeding.

**8.5   Set-Off.** In the event that any Purchaser Indemnified Party seeks indemnification under this Article 8 and Seller is required to make a payment hereunder, Purchaser shall be entitled to request Seller, at Seller's option, to (a) pay such amounts to any such Purchaser Indemnified Party or (b) satisfy all or any portion of such amount by offsetting any Note Amount or Deferred Amount whether currently due or otherwise due in the future, provided, that in the event that the aggregate of Damages exceeds the remaining amount of the Note Amount and the Deferred Amount to be paid to Seller, Purchaser shall be entitled to seek indemnification against Seller and the Owners for the remaining amount of Damages, provided further that in no event shall Purchaser be entitled to seek Damages in excess of the Purchase Price. In the event that Seller informs Purchaser of its desire to pay such amount as contemplated by clause (a) above, Seller shall make such payment within ten (10) business days of Purchaser's request hereunder.

22

**8.6    Limitations on Indemnification.**    Notwithstanding the indemnifications provisions set forth above, in no event shall Purchaser be entitled to seek Damages in excess of the Purchase Price.

**8.7    Remedies Cumulative.** The remedies provided in this Agreement shall be cumulative and shall not preclude any party from asserting any other right, or seeking any other remedies, against the other party.

## ARTICLE 9  MISCELLANEOUS PROVISIONS

**9.1    Expenses.** Whether or not the Transaction is consummated, each party shall pay its own costs and expenses in connection with this Agreement and the Transaction (including the fees and expenses of its advisers, accountants and legal counsel).

**9.2    Interpretation.**    Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

**9.3    Notices.**    All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received (a) when delivered personally, (b) one (1) business day following the day when deposited with a reputable, established overnight courier service for delivery to the intended addressee against receipt, or (c) three (3) business days following the day when deposited with the U.S. Postal Service as registered or certified mail, postage prepaid, return receipt requested and addressed as set forth below:

If to Purchaser:

RM BAKERY LLC
220 East 42nd Street, 29th Floor
New York, New York 10017
Attention: Mark Rimer
Telephone No.: (212) 537-3891
Facsimile No.: (480) 275-3703

With a copy to:

Mandelbaum Salsburg P.C.
3 Becker Farm Road, Suite 105
Roseland, NJ 07068
Attention: Jeffrey L. Wasserman, Esq.
Telephone No.: (973) 736-4600
Facsimile No.: (973) 325-7467
E-mail: jwasserman@lawfirm.ms

23

1401509v14 (Execution Copy)

If to Seller or Owners:

Beldotti Bakeries, LLC
605 Newfield Avenue
Stamford, CT 06905
Attention: Michael Beldotti
Telephone No.: (203) 348-9029
Facsimile No.: (203) 348-0484

E-mail: mbgoodbread@aol.com

With a copy to:

Law Office of John C. Polera, P.C.
1111 Summer Street, 5th Floor
Stamford, CT 06905
Attention: John C. Polera, Esq.
Telephone No.: (203) 327-2299
Facsimile No.: (203) 327-3311
E-mail: jpoleraesq@gmail.com

Any party may alter its notice address by notifying the other parties of such change of address in conformity with the provisions of this section.

**9.4     Governing Law.**  This Agreement is to be construed in accordance with and governed by the laws of the State of New York, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties.

**9.5     Jurisdiction; Service of Process.**

(a)     Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the courts of the State of New York, County of Westchester, or, if it has or can acquire the necessary jurisdiction, in the U.S. District Court for the Southern District of New York.  Each of the parties consents to the exclusive jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

(b)     EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY

24

RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION AMONG THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5.

**9.6    Attorneys' Fees.** In any proceeding to enforce the terms of this Agreement or the other documents executed in connection herewith, the prevailing party shall be awarded reasonable attorneys' fees incurred in connection with such enforcement proceeding. This provision shall survive the closing.

**9.7    No Third-Party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors and permitted assigns, and the parties do not intend to confer third-party beneficiary rights upon any other person.

**9.8    Specific Performance.** The parties hereby acknowledge and agree that the failure of any party to perform its agreements and covenants hereunder could cause irreparable injury to the other parties, for which damages, even if available, may not be an adequate remedy. Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder, in addition to any other rights or remedies available hereunder or at law or in equity.

**9.9    Amendments and Waivers.** This Agreement may not be amended, supplemented or modified except by an agreement in writing signed by each of the parties. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver. Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof.

**9.10    Publicity.** No party to this Agreement shall make, or cause or permit to be made, any press release or public announcement, or otherwise communicate with any news media, in respect of this Agreement or the Transaction without the prior written consent of the other parties, and the parties shall cooperate as to the timing and contents of any such press release or public announcement.

**9.11    Assignments; Successors and Assigns.** Except as otherwise provided herein, no party shall assign, or suffer or permit an assignment (by operation of law or otherwise) of, its rights or obligations under or interest in this Agreement without the prior written consent of the other parties. Any purported assignment or other disposition by a party, except as permitted herein, shall

25

be null and void. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, estates, and permitted assigns.

**9.12 Entire Agreement.** This Agreement, together with its exhibits and schedules, contains the entire understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, among the parties. The parties intend that this Agreement be the complete and exclusive embodiment of their agreement, and that any evidence, oral or written, of a prior or contemporaneous agreement that alters or modifies this Agreement shall not be admissible in any proceeding concerning this Agreement.

**9.13 Severability.** If any provision of this Agreement, or the application of any such provision to any person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**9.14 Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same agreement. The parties hereto agree that this Agreement may be transmitted between them or their respective attorneys by facsimile or electronic mail and, upon evidence of receipt of same, shall constitute delivery of this Agreement. The parties intend that faxed or electronic signatures constitute original signatures and that an agreement containing the signatures (original, facsimile or electronic) of all the parties is binding on the parties once sent via facsimile or via electronic mail or delivered to the other party's counsel.

### [Signature Page Follows]

26

1401509v14 (Execution Copy)

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed and delivered as of the date first written above.

PURCHASER:
RM BAKERY LLC

By: _____
Name: Mark Rimer
Title: CEO

SELLER:
BELDOTTI BAKERIES LLC

By: _____
Name: Michael Beldotti
Title: Member

OWNERS:

_____
MICHAEL BELDOTTI

_____
CHRISTOPHER BELDOTTI

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly
executed and delivered as of the date first written above.

PURCHASER:
RM BAKERY LLC

By: _____
Name: Mark Rimer
Title: CEO

SELLER:
BELDOTTI BAKERIES LLC
By: _____
Name: Michael Beldotti
Title: Member

OWNERS:

_____
MICHAEL BELDOTTI

_____
CHRISTOPHER BELDOTTI

## List of Exhibits and Schedules

Exhibit A – Wire Instructions
Exhibit B – Note
Exhibit C – Allocation of Purchase Price
Exhibit D – MB Consulting Agreement
Exhibit E – CB Consulting Agreement

Schedule 1.1(a) – Inventory
Schedule 1.1(b) – Machinery and Equipment
Schedule 1.1(c) – Intellectual Property
Schedule 1.1(d) – Business Contracts
Schedule 1.1(e) – Governmental Approvals
Schedule 1.3 – Assumed Liabilities
Schedule 2.3(c)(iii) – Existing Customers
Schedule 3.1 – Organization
Schedule 3.13 – Insurance Policies
Schedule 3.14(b) – Suppliers
Schedule 3.15(a) – Employees and Consultants
Schedule 3.16 – Benefit Plans
Schedule 7.1 – Transferred Employees

## EXHIBIT A

Wire Instructions

First County Bank
1042 High Ridge Rd
Stamford CT 06905

Routing #: 221172212

Beldotti Bakeries LLC
Acct.#: 668878948

Exhibit B

### NON-NEGOTIABLE
### PROMISSORY NOTE

**Amount: $525,000.00**                                    **Date: July 31, 2018**

FOR VALUE RECEIVED, **RM BAKERY LLC,** a New York limited liability company ("Purchaser"), promises to pay to **BELDOTTI BAKERIES LLC,** a Connecticut limited liability company ("Seller").

This Promissory Note (the "Note") is the promissory note that Purchaser is issuing, and has been executed and delivered, pursuant to, and is subject to the terms and conditions of, a certain Asset Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and among Seller, Purchaser, and the Owners (as defined in the Purchase Agreement). Capitalized terms used in this Note without definition have the respective meanings given to them in the Purchase Agreement.

**1. Purchaser's Promise to Pay Principal.** This Note has been signed and delivered to evidence Purchaser's obligation to pay Seller the Note Amount as contemplated in Sections 2.1 and 2.3 of the Purchase Agreement.

**2. Term.** This Note shall mature on the Maturity Date. "Maturity Date" shall mean the earlier of (i) the day immediately preceding the five (5) year anniversary of the date hereof; or (ii) the date upon which Seller elects to accelerate the indebtedness evidenced by this Note by reason of the occurrence of an Event of Default.

**3. Interest.** The Note Amount shall bear interest at a rate equal to six percent (6%) per annum. Interest will be calculated on the basis of a year of three hundred sixty-five (365) days and will accrue on a non-cumulative basis.

**4. Payment.** This Note, all accrued and unpaid interest and all other amounts due under this Note shall be due and payable in accordance with Section 2.3 of the Purchase Agreement. Notwithstanding the prior sentence, Purchaser shall be entitled to reduce the principal amount by the amount of any indemnification Seller or the Owners are required to make pursuant to Section 8.2 of the Purchase Agreement, if any, subject to the election by Seller to make payment pursuant to Section 8.5 of the Purchase Agreement.

**5. Payment Address.** All payments of principal and interest on this Note will be made by wire transfer of immediately available funds in accordance with the payment instructions set forth in Exhibit A of the Purchase Agreement or as Seller may otherwise designate to Purchaser in writing after the date hereof.

**6. Early Payments.** Purchaser shall have the right to make payments at any time before they are due without penalty.

**7. Late Charge for Overdue Payments.** If Seller has not received any payment within ten (10) days after the due date thereof, in addition to Seller's other remedies, Purchaser shall pay to Seller a late charge equal to five percent (5%) of the overdue payment for the purpose of deferring the

1

expenses incident to handling such delinquent payment or installment. The late charge shall be paid together with the late payment.

**8. Events of Default.** In the event of the occurrence of any event described herein (each an "Event of Default"), Seller may declare that Purchaser is in default hereunder. Any such declaration of an Event of Default shall be made by Seller in writing. Each of the following shall constitute an Event of Default: (i) if Purchaser fails to make three (3) payments required under this Note within eighty (80) days after receipt of written notice from Seller that such payment has not been received within the term of this Note; (ii) the failure of Purchaser to strictly comply with any other term or provision of this Note; or (iii) with respect to Purchaser, (a) admitting in writing of its or his inability to pay debts generally as they become due; (b) filing a petition in bankruptcy or a petition to take advantage of any insolvency act or other act for the relief or aid of debtors; (c) making an assignment for the benefit of creditors; (d) consenting to or acquiescing in the appointment of a receiver, liquidator, fiscal agent or trustee of itself or himself or of the whole or any substantial part of its or his property and assets; or (e) filing a petition or answer seeking relief under the federal bankruptcy laws or any other applicable law, or failing to deny the material allegations of or to contest any such petition filed against it and to cause such involuntary petition to be dismissed within sixty (60) days of the filing thereof. Upon Purchaser's receipt of written notice of an Event of Default (whether or not in a written notice), Purchaser shall immediately pay the full amount of all unpaid principal, any and all accrued interest, any other amounts due under this Note, including all of Seller's costs of collection and reasonable attorneys' fees.

**9. Waiver of Demand.** Purchaser waives demand, presentment for payment, protest, notice of protest, dishonor and of nonpayment and any and all lack of diligence or delays in collection or enforcement of this Note. Purchaser agrees to remain bound until the Principal sum of this Note or the amount outstanding and interest and all other sums payable hereunder are indefeasibly paid in full, notwithstanding any extensions of time for payment which may be granted (even though the period of extension be indefinite), and notwithstanding any inaction by, or failure to assert and legal right available to Seller.

**10. Costs of Collection.** If this Note is placed in the hands of an attorney for collection after it shall become due for any reason, or if collected by legal proceedings, or through the probate or bankruptcy courts, then all costs of collection, including reasonable attorneys' fees, shall be added to and collectible as principal.

**11. Assignment.** This Note may not be assigned, transferred, negotiated, pledged or otherwise disposed of without the written approval of Purchaser and Seller.

**12. Amendments and Waiver.** This Note may not be amended, supplemented or modified except by an agreement in writing signed by each of the parties. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver. Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege under this Note shall operate as a waiver thereof.

2

**13. Binding Effect.** The covenants and agreements contained in this Note shall bind, and the rights under it shall inure to, the respective successors and assigns of Purchaser and Seller, respectively.

**14. Governing Law.** This Note is to be construed in accordance with and governed by the laws of the State of New York, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties.

**15. Severability.** If any provision of this Note, or the application of any such provision to any person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Note, the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**16. Notice.** Any notice required or permitted to be given hereunder shall be given in the manner set forth in the Purchase Agreement.

**17. Consent to Jurisdiction.** Purchaser hereby irrevocably consents to the jurisdiction of the state courts of the State of New York in connection with any action or proceeding arising out of or relating to this Note. Purchaser hereby waives the defenses of forum non conveniens and improper venue.

**18. Trial by Jury.** PURCHASER EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION RELATING TO, IN CONNECTION WITH, OR ARISING OUT OF, THIS NOTE OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION WITH THIS NOTE.

**19. Miscellaneous.**

A. In the event that any provision of this Note or the application thereof to Purchaser or any circumstance in any jurisdiction governing this Note shall, to any extent, be invalid or unenforceable under any applicable statute, regulation or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Note and the application of any such invalid or unenforceable provision to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Note.

B. Time is of the essence as to all dates set forth in this Note, subject to any applicable notice or grace period provided herein; provided, however, whenever any payment to be made hereunder shall be stated to be due on a day other than a business day, such payment may be made on the next succeeding business day and such extension of time shall in such case be included in the computation of interest payable hereunder.

3

C. Purchaser hereby agrees to perform and comply with each of the terms, covenants and provisions contained in this Note and in any instrument evidencing or securing the indebtedness evidenced by this Note on the part of Purchaser to be observed and/or performed hereunder and thereunder.

D. No act of commission or omission of any kind or at any time upon the part of Seller in respect of any matter whatsoever shall in any way impair the rights of Seller to enforce any right, power, or benefit under this Note and no set-off, counterclaim, reduction or diminution of any obligation or any defense of any kind or nature which Purchaser has or may have against Seller shall be available hereunder to Purchaser.

E. The captions preceding the text of the various paragraphs contained in this Note are provided for convenience only and shall not be deemed to in any way affect or limit the meaning or construction of any of the provisions hereof.

F. In the event that the terms and provisions of this Note in any way conflict with the terms and provisions of the Purchase Agreement, the terms and provisions of this Note shall prevail.

**[Signature Page Follows]**

4

**Signatures.** By signing below, Purchaser agrees to the terms of this Note.

Witness:

RM BAKERY LLC

By:

Name: Mark Rimer

Title: CEO

Accepted and Agreed to:

**BELDOTTI BAKERIES LLC**

By: _____

Name: Michael Beldotti

Title: Member

5

**Signatures.** By signing below, Purchaser agrees to the terms of this Note.

Witness:

RM BAKERY LLC

_____        By: _____
                                        Name: Mark Rimer
                                        Title: CEO

Accepted and Agreed to:

BELDOTTI BAKERIES LLC

By: _____
Name: Michael Beldotti
Title: Member

5

**Exhibit C**
**Purchase Price Allocation**

| | |
|---|---|
| Equipment | $ 150,000 |
| Inventory | $ 35,000 |
| Customer Lists/Goodwill | $ 855,000 |
| | $1,040,000 |

Exhibit D

# CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement"), is made as of July 31, 2018 (the "Effective Date"), by and between **RM BAKERY LLC**, a New York limited liability company, with an address for notice at 220 East 42nd Street, 29th Floor, New York, New York 10017 (the "Company"), and **MICHAEL BELDOTTI**, an individual, with an address for notice at 68 Gaxton Road, Stamford, Connecticut 06905 ("Contractor"). The Company and Consultant are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

## R E C I T A L S :

**WHEREAS**, on the Effective Date, the Parties entered into an Asset Purchase Agreement by and among the Company, Beldotti Bakeries LLC ("Seller"), Contractor and Christopher Beldotti (the "Purchase Agreement"), and acquired certain assets of Seller and its bakery business (the "Business"); and

**WHEREAS**, pursuant to Section 2.5 of the Purchase Agreement, the Paties desire to enter into this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties hereby agree as follows:

1.    Engagement.  The Company hereby engages Consultant to assist in the transfer of the Business to the Company and perform such other services as are listed on the attached Schedule A (collectively, the "Services"). The parties agree that Consultant shall (a) perform all Services in a professional and workmanlike manner, and (b) not knowingly infringe upon any third party's intellectual property rights or knowingly use any confidential information of any third parties in performing the Services or otherwise complying with the terms of this Agreement. To the extent the Company requires that Consultant perform any additional Services not specified on Schedule A, the parties shall mutually agree on the actual number of additional days that Consultant shall devote, as well as the appropriate rate of compensation.

2.    Term.  The term of this Agreement (the "Term") shall be for one (1) year commencing on the Effective Date.

3.    Consideration for Services; Benefits.

3.1    Compensation.  In exchange for the Services, the Company shall pay Consultant Two Thousand Five Hundred Dollars ($2,500.00) per month, which shall be paid monthly in arrears by the fifth (5th) day of the month following the month it was earned.

3.2    Termination Bonus.  Within thirty (30) days following the expiration of the Term, the Company shall pay Consultant a termination bonus in an amount equal to three and one-half percent (3.5%) of the First Year Increased Revenue Amount.

(i)     "First Year Increased Revenue Amount" shall mean an amount equal to the Post-Closing 12-Month Revenue Amount, less the Pre-Closing 12-Month Revenue Amount.

(ii)    "Post-Closing 12-Month Revenue Amount" shall mean the gross revenue collected by the Company from the Existing Customers and any new customers referred to the Company by Consultant during the Term.

(iii)   "Pre-Closing 12-Month Revenue Amount" shall mean Two Million One Hundred Fifty Thousand Dollars ($2,150,000.00).

(iv)    "Existing Customers" shall have the meaning set forth in the Purchase Agreement.

3.3    Benefits.   Consultant is engaged as an independent contractor, thus Consultant shall not be entitled to any benefits.

4.    Expenses. Consultant shall be reimbursed for all reasonable and necessary expenses incurred by Consultant while performing the Services, subject to approval by the Company of any such expense. All expenses set forth herein shall accrue from the Effective Date and shall be paid by the Company within twenty (20) days after Consultant's submission of documentation reasonably requested by Company in support of such expenses.

5.    Activities During and Following Engagement.

5.1    Power to Bind.   Consultant shall have no right or power to bind the Company or to enter into any agreements or understandings on behalf of the Company.

5.2    Performance.   Consultant shall perform the Services in accordance with all applicable statutory and regulatory requirements applicable to the Services, if any, and the best of Consultant's ability.

5.3    Non-Competition; Non-Solicitation.   In consideration for the amounts payable to Consultant under the Purchase Agreement and this Agreement, Consultant acknowledges and agrees that Consultant shall be personally bound by the restrictions set forth in Section 6.5 of the Purchase Agreement.

5.4    Non-Disclosure. In consideration for the amounts payable to Consultant under the Purchase Agreement and this Agreement, Consultant acknowledges and agrees that Consultant shall be personally bound by the restrictions set forth in Section 6.6 of the Purchase Agreement.

5.5    Non-Disparagement. During and after the Term, Consultant and the Company each agree that neither Party shall make any false, defamatory, negative or disparaging statements about the other, and in the case of the Company, its managers, officers or directors.

1438112                                         2

5.6 <u>Reasonableness</u>. The Parties expressly agree that in light of the nature of the activities in which the Company is engaged, the restrictions set forth in Sections 5.3 and 5.4 are fair and reasonable, in concept and scope, and are necessary to protect the legitimate interests of the Company. Consultant hereby expressly waives any right to assert, any affirmative claim, counterclaim or defense to the enforcement of the provisions hereinabove on the basis that they are unreasonable, unnecessary, vague or unenforceable, in whole or in part, or that there is a failure of consideration. Consultant further agrees that any violation of any such sections would result in irreparable injuries to the Company for which adequate remedies are not available at law. Therefore, Consultant agrees that in the event of a breach or threatened breach of any such sections, the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief against all such actions breach (without the requirement to post bond) as well as monetary damages arising from such breach or threatened breach, all costs and expenses (including reasonable attorneys' fees) incurred by the Company in enforcement of such covenants, damages and an equitable accounting of all earnings, profits and other benefits arising from such breach or threatened breach. These injunctive remedies are cumulative and are in addition to any other rights and remedies the Company may have hereunder or at law or in equity.

5.8 <u>Return of Property</u>. Immediately upon the termination of Consultant's engagement, and at any time during Consultant's engagement, upon request from the Company, Consultant shall deliver to the Company all written, descriptive or tangible matter containing Confidential Information (as defined in the Purchase Agreement). Furthermore, all computers, parts, machines, components, hardware and software, electronic device storage media, code, notes, memoranda or data, including all copies thereof, made available or furnished to Consultant by the Company, any Intellectual Property, and any copies thereof, whether or not they contain Confidential Information, are and shall remain the sole and exclusive property of the Company and shall be returned immediately upon the termination of Consultant's engagement. Upon termination of Consultant's engagement (or sooner upon request by the Company), Consultant further agrees to permanently delete any and all Confidential Information (including, but not limited to, contact information and lists of the Company customers and prospects) that is contained on his personal equipment and devices including, but not limited to, personal digital assistants, blackberries and telephones in his possession or control.

5.9 <u>Survival</u>. The provisions of this <u>Section 5, and Sections 6 and 9</u>-18 shall survive the termination of this Agreement.

6. <u>Intellectual Property</u>.

6.1 <u>Definitions</u>. "<u>Intellectual Property</u>" means code, software, programs, applications, discoveries, developments, inventions, concepts, designs, ideas, know how, improvements, trade secrets, trademarks, trade dress, technical data, research, product or service ideas or plans, software, laboratory notebooks, processes, formulas, recipes, techniques, engineering designs and drawings and/or original works of authorship, whether or not patentable, registerable, copyrightable or otherwise legally protectable and includes, but is not limited to, any new product, machine, trade dress, article of manufacture, chemical or biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement

thereon. "Company Intellectual Property" means any and all Intellectual Property that Consultant may solely or jointly author, discover, develop, conceive, or reduce to practice during the course of his engagement with the Company, and/or any and all Intellectual Property owned by the Company whether or not Consultant contributed to it.

6.2    Works Made for Hire.    Consultant acknowledges that all Company Intellectual Property (and all rights therein, including, without limitation, copyright) that is made by him (solely or jointly with others) within the scope of and during the period of his engagement are "works made for hire" (to the greatest extent permitted by applicable law) that shall be the sole and exclusive property of the Company and are compensated by Consultant's compensation. In the event that it should be determined that such Company Intellectual Property or any portion thereof does not qualify as a work made for hire, Consultant shall and hereby does irrevocably assign to the Company all right, title, and interest that he may possess in such Company Intellectual Property, including, but not limited to, all copyright and proprietary rights relating thereto. Upon request, Consultant shall take such steps as are reasonably necessary to enable the Company to record such assignment, at the sole expense of the Company, and sign, upon request, any documents reasonably needed to confirm that any specific Company Intellectual Property is a work made for hire and to effectuate the assignment of its rights to the Company. If for any reason the Company Intellectual Property or any portion thereof would not be considered works made for hire under applicable law, Consultant hereby sells, assigns, and transfers to the Company, its successors and assigns, the entire right, title and interest in and to the patents, copyrights, trademarks, inventions, intellectual property rights and other rights of every kind now or later known or recognized embodied in the Company Intellectual Property and any patent, copyright or trademark registrations and applications relating thereto and any renewals and extensions thereof, and in and to all patents, inventions and works based upon, derived from, or incorporating the Company Intellectual Property or any part thereof, and in and to all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for infringement based on the patents, copyrights, trademarks, inventions and other intellectual property rights embodied in the Company Intellectual Property and in and to all rights corresponding to the foregoing throughout the world. Consultant hereby waives and irrevocably quitclaims to the Company or its designee any and all claims, of any nature whatsoever, if any, that Consultant now has or may hereafter have for infringement of any and all Company Intellectual Property.

6.3    Records.    Consultant agrees to keep and maintain adequate and current written records of all Company Intellectual Property made by him (solely or jointly with others) during the term of his engagement. The records may be in the form of notes, sketches, drawings, designs, flow charts, graphics, program files, models, prototypes, databases, correspondence, reports, blue prints, manuals, studies, experiments, electronic data or recordings, laboratory notebooks, computer or electronic device storage media, code, descriptions or other papers, documents, materials or things in any other format. The records will be available to and remain the sole property of the Company at all times. Consultant shall deliver all such records (including any copies thereof) to the Company at the time of termination of his engagement.

6.4    Assistance.    Consultant agrees to assist the Company, or its designee, at the Company's sole expense, in every reasonable way to secure the Company's, or its designee's,

rights in the Company Intellectual Property and any copyrights, patents, trademarks, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary, at the Company's request and in the Company's sole discretion, in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Intellectual Property, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Consultant further agrees that his obligation to execute or cause to be executed, when it is in his power to do so, any such instrument or papers shall continue during and at all times after the end of the relationship and until the expiration of the last such right in and to the Company Intellectual Property to expire in any country of the world.

7.    Notice Pursuant to the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1833(b). Consultant acknowledges and agrees that he is on notice, pursuant to the DTSA 18 U.S.C. § 1833(b), that:

(b) Immunity From Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing.—

(1) Immunity.—An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—

(A) is made—

(i)    in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

(ii)    solely for the purpose of reporting or investigating a suspected violation of law; or

(B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2) Use of trade secret information in anti-retaliation lawsuit.—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—

(A)    files any document containing the trade secret under seal; and

(B)    does not disclose the trade secret, except pursuant to court order.

8.    No Employment Relationship. Nothing in this Agreement shall be construed as creating an agency, partnership, joint venture, franchise, or employment relationship between the Parties. Consultant shall exercise Consultant's own discretion over the method and manner of performing the Services. The Company agrees that it will not exercise control over Consultant except as may be reasonably necessary to ensure performance of and compliance with this Agreement. Consultant acknowledges that as an independent contractor, (a) Consultant is not an

employee of the Company and therefore is not entitled to any benefits that the Company may offer its employees; (b) no agent or employee of Consultant is or shall be deemed to be an employee of the Company; (c) Consultant is solely and entirely responsible for Consultant's own acts in connection with the performance of the Services; (d) all income taxes payable to any government or other public authority in respect of any fees paid pursuant to the provisions of this Agreement are Consultant's responsibility; and (e) the Company will issue to Consultant a Form 1099 (Miscellaneous Income) and it is Consultant's responsibility to include the reported amount on Consultant's individual tax return.

9.      Governing Law.  This Agreement is to be construed in accordance with and governed by the laws of the State of New York, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties.

10.     Jurisdiction; Service of Process.

10.1    Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the courts of the State of New York, County of New York, or, if it has or can acquire the necessary jurisdiction, in the U.S. District Court for the Southern District of New York.  Each of the parties consents to the exclusive jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

10.2    Jury Waiver.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION AMONG THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.

11.     Attorneys' Fees.  In any proceeding to enforce the terms of this Agreement or the other documents executed in connection herewith, the prevailing party shall be awarded reasonable attorneys' fees incurred in connection with such enforcement proceeding.

12.  Amendments and Waiver. This Agreement may not be amended, supplemented or modified except by an agreement in writing signed by each of the Parties. No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver. Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof.

13.  Successors; Assignment. This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of Company's assets and business. Consultant acknowledges that Consultant's services are unique and personal. Accordingly, Consultant may not assign Consultant's rights or delegate Consultant's duties or obligations under this Agreement.

14.  Entire Agreement. This Agreement, together with Schedule A attached hereto, contains the entire understanding among the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, among the Parties. The Parties intend that this Agreement and the Purchase Agreement be the complete and exclusive embodiment of their agreement, and that any evidence, oral or written, of a prior or contemporaneous agreement that alters or modifies this Agreement shall not be admissible in any proceeding concerning this Agreement.

15.  Severability. If any provision of this Agreement, or the application of any such provision to any person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

16.  Withholding. Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company under applicable federal, state or local income or employment tax laws or similar statutes or other provisions of law then in effect.

17.  Notice. Any notice required or permitted to be given hereunder shall be given in the manner set forth in the Purchase Agreement.

18.  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall be deemed one and the same agreement.

19.  Opportunity to Review. Each party warrants and represents that it or he has consulted with an attorney of its or his choice, or voluntarily chose not to, concerning the execution, the meaning and import of this Agreement, and has read this Agreement and fully understands the terms hereof as signified by each party's signature below, and is executing the same of each party's own free will for the purposes and consideration herein expressed.

1438112                                                7

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the Effective Date.

WITNESS:

_Daniel Wilczynski_

RM BAKERY LLC
By: BKD Group LLC

By:
Name: Mark Rimor
Title:   CEO

CONSULTANT:

_____

MICHAEL BELDOTTI

execution, the meaning and import of this Agreement, and has read this Agreement and fully understands the terms hereof as signified by each party's signature below, and is executing the same of each party's own free will for the purposes and consideration herein expressed.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the Effective Date.

WITNESS:

RM BAKERY LLC
By: BKD Group LLC

By:_____
Name: Mark Rimer
Title:   CEO

CONSULTANT:

MICHAEL BELDOTTI

1438112                                      8

## Schedule A
### Description of Services

- manage and/or support transition of Good Bread business to RM Bakery ownership, including but not limited to product, support and delivery as well as personnel integration

- transition of production from Port Chester location to Coster Street location

- develop new sales and preserve new sales and customer relationships

- assist in the sale and/or disposal of existing excess physical assets at Port Chester location

- communication of RM Bakery determined messaging around the sale of Good Bread and around the RM Bakery customer sales pitch

Exhibit E

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement"), is made as of July 31, 2018 (the "Effective Date"), by and between **RM BAKERY LLC**, a New York limited liability company, with an address for notice at 220 East 42nd Street, 29th Floor, New York, New York 10017 (the "Company"), and **CHRISTOPHER BELDOTTI**, an individual, with an address for notice at 53 Sanford Lane, Stamford, Connecticut 06905 ("Contractor"). The Company and Consultant are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

## RECITALS:

**WHEREAS**, on the Effective Date, the Parties entered into an Asset Purchase Agreement by and among the Company, Beldotti Bakeries LLC ("Seller"), Contractor and Michael Beldotti (the "Purchase Agreement"), and acquired certain assets of Seller and its bakery business (the "Business"); and

**WHEREAS**, pursuant to Section 2.5 of the Purchase Agreement, the Parties desire to enter into this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties hereby agree as follows:

1.      Engagement.  The Company hereby engages Consultant to assist in the transfer of the Business to the Company and perform such other services as are listed on the attached Schedule A (collectively, the "Services").  The parties agree that Consultant shall (a) perform all Services in a professional and workmanlike manner, and (b) not knowingly infringe upon any third party's intellectual property rights or knowingly use any confidential information of any third parties in performing the Services or otherwise complying with the terms of this Agreement.  To the extent the Company requires that Consultant perform any additional Services not specified on Schedule A, the parties shall mutually agree on the actual number of additional days that Consultant shall devote, as well as the appropriate rate of compensation.

2.      Term.  The term of this Agreement (the "Term") shall be for one (1) year commencing on the Effective Date.

3.      Consideration for Services; Benefits.

3.1      Compensation.  In exchange for the Services, the Company shall pay Consultant Two Thousand Five Hundred Dollars ($2,500.00) per month, which shall be paid monthly in arrears by the fifth (5th) day of the month following the month it was earned.

3.2      Termination Bonus.  Within thirty (30) days following the expiration of the Term, the Company shall pay Consultant a termination bonus in an amount equal to three and one-half percent (3.5%) of the First Year Increased Revenue Amount.

1438113                                          1

(i) "First Year Increased Revenue Amount" shall mean an amount equal to the Post-Closing 12-Month Revenue Amount, less the Pre-Closing 12-Month Revenue Amount.

(ii) "Post-Closing 12-Month Revenue Amount" shall mean the gross revenue collected by the Company from the Existing Customers and any new customers referred to the Company by Consultant during the Term.

(iii) "Pre-Closing 12-Month Revenue Amount" shall mean Two Million One Hundred Fifty Thousand Dollars ($2,150,000.00).

(iv) "Existing Customers" shall have the meaning set forth in the Purchase Agreement.

3.3 Benefits. Consultant is engaged as an independent contractor, thus Consultant shall not be entitled to any benefits.

4. Expenses. Consultant shall be reimbursed for all reasonable and necessary expenses incurred by Consultant while performing the Services, subject to approval by the Company of any such expense. All expenses set forth herein shall accrue from the Effective Date and shall be paid by the Company within twenty (20) days after Consultant's submission of documentation reasonably requested by Company in support of such expenses.

5. Activities During and Following Engagement.

5.1 Power to Bind. Consultant shall have no right or power to bind the Company or to enter into any agreements or understandings on behalf of the Company.

5.2 Performance. Consultant shall perform the Services in accordance with all applicable statutory and regulatory requirements applicable to the Services, if any, and the best of Consultant's ability.

5.3 Non-Competition; Non-Solicitation. In consideration for the amounts payable to Consultant under the Purchase Agreement and this Agreement, Consultant acknowledges and agrees that Consultant shall be personally bound by the restrictions set forth in Section 6.5 of the Purchase Agreement.

5.4 Non-Disclosure. In consideration for the amounts payable to Consultant under the Purchase Agreement and this Agreement, Consultant acknowledges and agrees that Consultant shall be personally bound by the restrictions set forth in Section 6.6 of the Purchase Agreement.

5.5 Non-Disparagement. During and after the Term, Consultant and the Company each agree that neither Party shall make any false, defamatory, negative or disparaging statements about the other, and in the case of the Company, its managers, officers or directors.

1438113                                     2

5.6    Reasonableness. The Parties expressly agree that in light of the nature of the activities in which the Company is engaged, the restrictions set forth in Sections 5.3 and 5.4 are fair and reasonable, in concept and scope, and are necessary to protect the legitimate interests of the Company.  Consultant hereby expressly waives any right to assert, any affirmative claim, counterclaim or defense to the enforcement of the provisions hereinabove on the basis that they are unreasonable, unnecessary, vague or unenforceable, in whole or in part, or that there is a failure of consideration.  Consultant further agrees that any violation of any such sections would result in irreparable injuries to the Company for which adequate remedies are not available at law. Therefore, Consultant agrees that in the event of a breach or threatened breach of any such sections, the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief against all such actions breach (without the requirement to post bond) as well as monetary damages arising from such breach or threatened breach, all costs and expenses (including reasonable attorneys' fees) incurred by the Company in enforcement of such covenants, damages and an equitable accounting of all earnings, profits and other benefits arising from such breach or threatened breach. These injunctive remedies are cumulative and are in addition to any other rights and remedies the Company may have hereunder or at law or in equity.

5.8    Return of Property. Immediately upon the termination of Consultant's engagement, and at any time during Consultant's engagement, upon request from the Company, Consultant shall deliver to the Company all written, descriptive or tangible matter containing Confidential Information (as defined in the Purchase Agreement). Furthermore, all computers, parts, machines, components, hardware and software, electronic device storage media, code, notes, memoranda or data, including all copies thereof, made available or furnished to Consultant by the Company, any Intellectual Property, and any copies thereof, whether or not they contain Confidential Information, are and shall remain the sole and exclusive property of the Company and shall be returned immediately upon the termination of Consultant's engagement. Upon termination of Consultant's engagement (or sooner upon request by the Company), Consultant further agrees to permanently delete any and all Confidential Information (including, but not limited to, contact information and lists of the Company customers and prospects) that is contained on his personal equipment and devices including, but not limited to, personal digital assistants, blackberries and telephones in his possession or control.

5.9    Survival. The provisions of this Section 5, and Sections 6 and 9-18 shall survive the termination of this Agreement.

6.    Intellectual Property.

6.1    Definitions.  "Intellectual Property" means code, software, programs, applications, discoveries, developments, inventions, concepts, designs, ideas, know how, improvements, trade secrets, trademarks, trade dress, technical data, research, product or service ideas or plans, software, laboratory notebooks, processes, formulas, recipes, techniques, engineering designs and drawings and/or original works of authorship, whether or not patentable, registerable, copyrightable or otherwise legally protectable and includes, but is not limited to, any new product, machine, trade dress, article of manufacture, chemical or biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement

1438113                                      3

thereon. "Company Intellectual Property" means any and all Intellectual Property that Consultant may solely or jointly author, discover, develop, conceive, or reduce to practice during the course of his engagement with the Company, and/or any and all Intellectual Property owned by the Company whether or not Consultant contributed to it.

6.2    Works Made for Hire.    Consultant acknowledges that all Company Intellectual Property (and all rights therein, including, without limitation, copyright) that is made by him (solely or jointly with others) within the scope of and during the period of his engagement are "works made for hire" (to the greatest extent permitted by applicable law) that shall be the sole and exclusive property of the Company and are compensated by Consultant's compensation. In the event that it should be determined that such Company Intellectual Property or any portion thereof does not qualify as a work made for hire, Consultant shall and hereby does irrevocably assign to the Company all right, title, and interest that he may possess in such Company Intellectual Property, including, but not limited to, all copyright and proprietary rights relating thereto. Upon request, Consultant shall take such steps as are reasonably necessary to enable the Company to record such assignment, at the sole expense of the Company, and sign, upon request, any documents reasonably needed to confirm that any specific Company Intellectual Property is a work made for hire and to effectuate the assignment of its rights to the Company. If for any reason the Company Intellectual Property or any portion thereof would not be considered works made for hire under applicable law, Consultant hereby sells, assigns, and transfers to the Company, its successors and assigns, the entire right, title and interest in and to the patents, copyrights, trademarks, inventions, intellectual property rights and other rights of every kind now or later known or recognized embodied in the Company Intellectual Property and any patent, copyright or trademark registrations and applications relating thereto and any renewals and extensions thereof, and in and to all patents, inventions and works based upon, derived from, or incorporating the Company Intellectual Property or any part thereof, and in and to all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for infringement based on the patents, copyrights, trademarks, inventions and other intellectual property rights embodied in the Company Intellectual Property and in and to all rights corresponding to the foregoing throughout the world. Consultant hereby waives and irrevocably quitclaims to the Company or its designee any and all claims, of any nature whatsoever, if any, that Consultant now has or may hereafter have for infringement of any and all Company Intellectual Property.

6.3    Records.    Consultant agrees to keep and maintain adequate and current written records of all Company Intellectual Property made by him (solely or jointly with others) during the term of his engagement. The records may be in the form of notes, sketches, drawings, designs, flow charts, graphics, program files, models, prototypes, databases, correspondence, reports, blue prints, manuals, studies, experiments, electronic data or recordings, laboratory notebooks, computer or electronic device storage media, code, descriptions or other papers, documents, materials or things in any other format. The records will be available to and remain the sole property of the Company at all times. Consultant shall deliver all such records (including any copies thereof) to the Company at the time of termination of his engagement.

6.4    Assistance.    Consultant agrees to assist the Company, or its designee, at the Company's sole expense, in every reasonable way to secure the Company's, or its designee's,

rights in the Company Intellectual Property and any copyrights, patents, trademarks, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary, at the Company's request and in the Company's sole discretion, in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Intellectual Property, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Consultant further agrees that his obligation to execute or cause to be executed, when it is in his power to do so, any such instrument or papers shall continue during and at all times after the end of the relationship and until the expiration of the last such right in and to the Company Intellectual Property to expire in any country of the world.

7.      Notice Pursuant to the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1833(b). Consultant acknowledges and agrees that he is on notice, pursuant to the DTSA 18 U.S.C. § 1833(b), that:

(b) Immunity From Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing.—

(1) Immunity.—An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—

(A) is made—

(i)      in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

(ii)      solely for the purpose of reporting or investigating a suspected violation of law; or

(B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2) Use of trade secret information in anti-retaliation lawsuit.—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—

(A)      files any document containing the trade secret under seal; and

(B)      does not disclose the trade secret, except pursuant to court order.

8.      No Employment Relationship. Nothing in this Agreement shall be construed as creating an agency, partnership, joint venture, franchise, or employment relationship between the Parties. Consultant shall exercise Consultant's own discretion over the method and manner of performing the Services. The Company agrees that it will not exercise control over Consultant except as may be reasonably necessary to ensure performance of and compliance with this Agreement. Consultant acknowledges that as an independent contractor, (a) Consultant is not an

1438113                                          5

employee of the Company and therefore is not entitled to any benefits that the Company may offer its employees; (b) no agent or employee of Consultant is or shall be deemed to be an employee of the Company; (c) Consultant is solely and entirely responsible for Consultant's own acts in connection with the performance of the Services; (d) all income taxes payable to any government or other public authority in respect of any fees paid pursuant to the provisions of this Agreement are Consultant's responsibility; and (e) the Company will issue to Consultant a Form 1099 (Miscellaneous Income) and it is Consultant's responsibility to include the reported amount on Consultant's individual tax return.

9.      Governing Law.  This Agreement is to be construed in accordance with and governed by the laws of the State of New York, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties.

10.     Jurisdiction; Service of Process.

10.1    Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the courts of the State of New York, County of New York, or, if it has or can acquire the necessary jurisdiction, in the U.S. District Court for the Southern District of New York.  Each of the parties consents to the exclusive jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

10.2    Jury Waiver.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION AMONG THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.

11.     Attorneys' Fees.  In any proceeding to enforce the terms of this Agreement or the other documents executed in connection herewith, the prevailing party shall be awarded reasonable attorneys' fees incurred in connection with such enforcement proceeding.

1438113                                          6

12.   Amendments and Waiver.  This Agreement may not be amended, supplemented or modified except by an agreement in writing signed by each of the Parties.  No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver. Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof.

13.   Successors; Assignment.  This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of Company's assets and business. Consultant acknowledges that Consultant's services are unique and personal. Accordingly, Consultant may not assign Consultant's rights or delegate Consultant's duties or obligations under this Agreement.

14.   Entire Agreement.  This Agreement, together with Schedule A attached hereto, contains the entire understanding among the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, among the Parties.  The Parties intend that this Agreement and the Purchase Agreement be the complete and exclusive embodiment of their agreement, and that any evidence, oral or written, of a prior or contemporaneous agreement that alters or modifies this Agreement shall not be admissible in any proceeding concerning this Agreement.

15.   Severability.  If any provision of this Agreement, or the application of any such provision to any person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

16.   Withholding.  Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company under applicable federal, state or local income or employment tax laws or similar statutes or other provisions of law then in effect.

17.   Notice.  Any notice required or permitted to be given hereunder shall be given in the manner set forth in the Purchase Agreement.

18.   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall be deemed one and the same agreement.

19.   Opportunity to Review.  Each party warrants and represents that it or he has consulted with an attorney of its or his choice, or voluntarily chose not to, concerning the execution, the meaning and import of this Agreement, and has read this Agreement and fully understands the terms hereof as signified by each party's signature below, and is executing the same of each party's own free will for the purposes and consideration herein expressed.

1438113                              7

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

WITNESS:

RM BAKERY LLC
By: BKD Group LLC

By: _____
Name: Mark Rimer
Title: CEO


CONSULTANT:

_____

**CHRISTOPHER BELDOTTI**

execution, the meaning and import of this Agreement, and has read this Agreement and fully understands the terms hereof as signified by each party's signature below, and is executing the same of each party's own free will for the purposes and consideration herein expressed.

**IN WITNESS WHEREOF,** the Parties hereto have duly executed this Agreement as of the Effective Date.

WITNESS:

**RM BAKERY LLC**
By: BKD Group LLC

By:_____
Name: Mark Rimer
Title:   CEO

CONSULTANT:

CHRISTOPHER BELDOTTI

## Schedule A
### Description of Services

- manage and/or support transition of Good Bread business to RM Bakery ownership, including but not limited to product, support and delivery as well as personnel integration

- transition of production from Port Chester location to Coster Street location

- develop new sales and preserve new sales and customer relationships

- assist in the sale and/or disposal of existing excess physical assets at Port Chester location

- communication of RM Bakery determined messaging around the sale of Good Bread and around the RM Bakery customer sales pitch

Schedule 1.1 (a)
Good Bread Bakery - Inventory 7/6/18
<u>Ingredients</u>

| Item | Qty | | Unit Price | | Total |
|---|---|---|---|---|---|
| | | | | total | |
| Tomatoes | 1 | $ | 17.95 | $ | 17.95 |
| Pomace Oil | 4 | $ | 13.00 | $ | 52.00 |
| Canola Oil | 3 | $ | 18.35 | $ | 55.05 |
| Shortening | 2 | $ | 35.61 | $ | 71.22 |
| Pan Spray | 9 | $ | 16.23 | $ | 146.07 |
| Dill Weed | 1 | $ | 12.21 | $ | 12.21 |
| Granul Garlic | 1 | $ | 14.85 | $ | 14.85 |
| Rock Salt course | 1 | $ | 15.94 | $ | 15.94 |
| Molasses | 1 | $ | 14.33 | $ | 14.33 |
| rosemary | 2 | $ | 8.97 | $ | 17.94 |
| Cheese | 13 | $ | 4.18 | $ | 54.34 |
| Butter | 4 | $ | 101.69 | $ | 406.76 |
| Garlic | 1 | $ | 51.92 | $ | 51.92 |
| Onions | 1 | $ | 15.96 | $ | 15.96 |
| Yolks | 12 pail | $ | 69.00 | $ | 828.00 |
| Whole eggs | 13 pail | $ | 47.20 | $ | 613.60 |
| Honey | 2 pail | $ | 129.00 | $ | 258.00 |
| Raisins | 3 | $ | 43.00 | $ | 129.00 |
| Diced Orange | 1 | $ | 62.00 | $ | 62.00 |
| Walnut | 3 boxes | $ | 115.75 | $ | 347.25 |
| Shortening | 2 boxes | $ | 49.25 | $ | 98.50 |
| rye chops | 2 | $ | 25.25 | $ | 50.50 |
| Milk Powder | 1 | $ | 81.50 | $ | 81.50 |
| Rolled Oats | 2 | $ | 29.25 | $ | 58.50 |
| Dried Cranberry | 2 boxes | $ | 66.75 | $ | 133.50 |
| Flax Seed | 2 | $ | 39.50 | $ | 79.00 |
| Caraway Seed | 1 | $ | 114.00 | $ | 114.00 |
| Sunflower Seed | 2 | $ | 52.50 | $ | 105.00 |
| Sesame Seed | 1 | $ | 69.00 | $ | 69.00 |
| Wheat Flour | 10 | $ | 20.00 | $ | 200.00 |
| White Rye | 2 | $ | 20.50 | $ | 41.00 |
| Cake Flour | 1 | $ | 22.50 | $ | 22.50 |
| Pretzel Mix | 1 | $ | 56.75 | $ | 56.75 |
| Dark Rye | 2 | $ | 21.50 | $ | 43.00 |
| fresh eggs | 1.5 cases | $ | 38.50 | $ | 57.75 |
| Durum | 3 | $ | 23.00 | $ | 69.00 |
| Cocoa Powder | 1 | $ | 121.00 | $ | 121.00 |
| Corn Muffin Mix | 1 | $ | 60.55 | $ | 60.55 |
| Corn Meal | 2 | $ | 16.50 | $ | 16.50 |
| Salt | 4 | $ | 13.50 | $ | 54.00 |
| Gran Sugar | 6 | $ | 25.50 | $ | 153.00 |
| Oat Bran Flour | 1 | $ | 58.75 | $ | 58.75 |
| Spelt | 1 | $ | 76.99 | $ | 76.99 |
| Yeast | 160 | $ | 0.92 | $ | 147.20 |

| | | | | |
|---|---|---|---|---|
| Olives 5lb | 1 | $ 87.78 | $ | 87.78 |
| Pumpkin seeds | 1 | $ 75.50 | $ | 75.50 |
| Anise seeds | 1 | $ 31.50 | $ | 31.50 |
| Flour 50lb | 32 bags | $ 20.45 | $ | 654.40 |

Paper Goods

| | | | | |
|---|---|---|---|---|
| Tote Boxes | 75 | $ 1.29 | $ | 96.75 |
| 19x14x5 box 25ct | 1 | $ 47.22 | $ | 47.22 |
| full sheet box 25ct | 1 | $ 44.52 | $ | 44.52 |
| quarter Barrel Bag 400ct | 1 | $ 43.49 | $ | 43.49 |
| 18x7x18xbrown bag 200ct | 4 | $ 37.75 | $ | 151.00 |
| 60 HID bag liners 200ct | 1 | $ 21.25 | $ | 21.25 |
| 13x7x7xbrown bag 250ct | 1 | $ 43.31 | $ | 43.31 |
| 20" Poly bag 1000ct | 4 | $ 20.95 | $ | 83.80 |
| Broom | 3 | $ 7.95 | $ | 23.85 |
| Pan Liners 1000ct | 2 | $ 34.32 | $ | 68.64 |
| 15" Poly Bag 1000ct | 1 | $ 18.95 | $ | 18.95 |
| 20-30 Gal. Bag 250ct | 1 | $ 18.50 | $ | 18.50 |
| 22x16x58 poly bag  100ct | 2 | $ 35.65 | $ | 71.30 |
| sendel box top | 8 | | | |
| sendel box bottom | 8 | | 1200.00 total | |
| Mini box | 4 | | | |

## Schedule 1.1(b)
## Machinery and Equipment

| Equipment Listing | | purchase | value | |
|---|---|---|---|---|
| new revent double rack oven | apr. 2016 | $ 32,300.00 | $ | 20,000.00 |
| old revent double rack ovens | | n/a | $ | 2,000.00 |
| 1 miwe 4 deck oven with loader | feb. 2012 | $ 70,200.00 | $ | 25,000.00 |
| 1 12 rack steam box | | n/a | not taking | |
| 1 walk in refrig. | | n/a | not taking | |
| 1 80 qt Hobart mixer | | n/a | $ | 7,000.00 |
| large spiral mixer | feb. 2012 | $ 16,000.00 | $ | 5,000.00 |
| small spiral mixer | | n/a | $ | 3,000.00 |
| 1 Italsio silo system (1 40,000lb and 1 20,000lb capacity) | | | $ | 20,000.00 |
| 1 jac baguette machine | aug. 2016 | $ 9,850.00 | $ | 4,000.00 |
| 1 duchess divider rounder – model JN | apr. 2014 | $ 12,800.00 | $ | 4,000.00 |
| 1 zeloiete ciabatta machine | apr. 2012 | $ 20,875.00 | $ | 8,000.00 |
| 1 erika divider rounder | | n/a | $ | 500.00 |
| 1 blomhoft 860 (Pullman machine | | n/a | $ | 500.00 |
| 1 jac divider | | n/a | $ | 500.00 |
| 1 douglas washing machine | Jun-13 | $ 16,800.00 | $ | 4,000.00 |
| 1 jac bread slicer duro | | n/a | $ | 1,000.00 |
| 1 jac bread slicer duro 1"cut | | n/a | $ | 1,000.00 |
| 1 chute jac slicer | | n/a | $ | 1,000.00 |
| 1 chute oliver slicer | Jul-16 | $ 12,000.00 | $ | 4,000.00 |
| 25 bakers racks | | n/a | $ | 100.00 |
| 1 true 2 door freezer | Jun-15 | $ 3,750.00 | $ | 1,000.00 |
| 1 chest freezer | | n/a | $ 30.00 | |
| 3 4x8 butcher block tables | | n/a | $ | 250.00 |
| 1 5x12 butcher block table | | n/a | $ | 1,500.00 |
| 2 doran dough scales | | n/a | $ | 1,000.00 |

1434427

Asset Purchase Agreement    Page 75 of 99

| | | | |
|---|---|---|---|
| 400 baking pans | n/a | $ | 800.00 |
| 100 hamburger bans | n/a | $ | 250.00 |
| Assorted small to large Pullmans | n/a | $ | 1,000.00 |

### Schedule 1.1(c)
### Intellectual Property

Trade name: Good Bread Bakery– Please note that Seller has never registered this name and makes no representations as to ownership.
Website: www.goodbreadbakery.com
Logo: See attached

1434427



### Schedule 1.1(d)
**Business Contracts**

None.

**Schedule 1.1(e)**
**Governmental Approvals**

New York State -Department of Agriculture and Markets – Food Processing License – expires
8/14/2018

<u>**Schedule 1.3**</u>
**Assumed Liabilities**

None.

**Schedule 2.3(c)(vii)**
**Existing Customers**

See attached.

<u>**Schedule 3.1**</u>
**Organization**

Connecticut – State of Formation
New York – Qualification as a Foreign LLC

### <u>Schedule 3.13</u>
**Insurance Policies**

The Hartford – Business Owners Policy #31SBAVR5227
The Hartford – Workers Comp Policy # 31WECCI0915

See attached Accord Form

| ACORD® | CERTIFICATE OF LIABILITY INSURANCE | DATE (MM/DD/YYYY) 1/29/2018 |
|---|---|---|

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Thomas Miller | | |
|---|---|---|---|
| Cross Insurance-Stamford, Inc. 30 Buxton Farm Road Stamford CT 06905 | PHONE (A/C, No, Ext): (203) 321-0001 | | FAX (A/C, No): (203) 461-8200 |
| | E-MAIL ADDRESS: tmiller@crossagency.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: Hartford Fire Ins Co | | 19682 |
| Baldotti Bakeries LLC Dba Good Bread Bakery 605 Newfield Ave Stamford CT 06905 | INSURER B: Republic-Franklin Ins Co | | 12475 |
| | INSURER C: Rated by multiple co | | 00914 |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

| COVERAGES | CERTIFICATE NUMBER:2017-18 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR | X | | 31SBAVR5227 | 9/16/2017 | 9/16/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: X POLICY PRO-JECT LOC OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | Employee Benefits | $ 2,000,000 |
| B | AUTOMOBILE LIABILITY X ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON-OWNED AUTOS | | | 4707949 | 12/6/2017 | 12/6/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | Uninsured motorist combined | $ 1,000,000 |
| A | X UMBRELLA LIAB OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ 10,000 | | | 31SBAVR5227 | 9/16/2017 | 9/16/2018 | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | 31WECCI0915 | 12/6/2017 | 12/6/2018 | X PER STATUTE OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
NEWFIELD GREEN SHOPPING CENTER
THE CERTIFICATE HOLDER IS AN ADDITIONAL INSURED FOR GENERAL LIABILITY PER FORM SS 00 08 04 05

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Urstadt Biddle Properties Inc. 321 Railroad Avenue, 2nd flr. Greenwich, CT 06830 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE Thomas Miller/CT2 *Thomas N. Miller* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
INS025 (201401)
The ACORD name and logo are registered marks of ACORD

**Schedule 3.14(b)**
**Suppliers**

See attached.

# Beldotti Bakeries LLC

## EXPENSES BY VENDOR SUMMARY

### January - December 2017

|  | TOTAL |
|---|---|
| A.D.M Milling | 114,943.06 |
| Bagel Emporium | 56,885.03 |
| Con Edison | 29,329.65 |
| Crown Products | 1,279.79 |
| CZ Produce | 602.50 |
| Dount Depot | 1,597.41 |
| fresh & tasty baked products | 1,875.76 |
| Intercounty Bakers | 73,316.07 |
| JJ Cassone Bakery | 32,560.42 |
| Neri Bakery | 6,263.22 |
| NEW YORK FOLDING BOX | 8,884.22 |
| Norwalk Linen | 8,478.37 |
| Otto Brehm | 274.45 |
| president container group | 13,559.92 |
| Sanches Distributors | 7,036.09 |
| Square Bagel | 780.39 |
| Strauss Paper | 2,163.81 |
| United Pest Control | 2,518.82 |
| **TOTAL** | **$362,348.98** |

## Schedule 3.15(a)
### Employees and Consultants

See attached.

**Company: BELDOTTI BAKERIES LLC    Report: Employee Summary    Year: 2018    Quarter: 3**

**Aguilar, Patricia**
Pay Frequency:Weekly
Emp Type: Part time
Status: Active
Department: 250 - GB Packing
Birth Date:
Hire Date: 4/23/2018
SSN:
Hourly: 11.0000
Mobile:
Home Phone:

| Earnings | | Taxes | Withholding | YTD Amount | Deductions (Per Pay) | Disbursement Type |
|---|---|---|---|---|---|---|
| Gross | 1237.05 | FIT | Single/5 | 0.00 | | |
| Regular | 1233.43 | SOCSEC | | 76.70 | | |
| Overtime | 3.83 | MEDICARE | | 17.94 | | |
| | | NY SIT | | 7.55 | | |
| | | NY PFL | | 1.55 | | |
| | | NY-New York City Resident LIT | | 6.13 | | |
| | | | New York voluntary disability 0.50% | 0.50% | 3.00 | Check |

**Alvarez, Esmeralda C**
Status: Active
Home Phone:
Mobile:
Hourly: 11.0000
SSN:
Birth Date:
Hire Date: 2/6/2018
Department: 250 - GB Packing
Status: Active
Emp Type: Full time

| Earnings | | Taxes | Withholding | YTD Amount | Deductions | Disbursement Type |
|---|---|---|---|---|---|---|
| Gross | 7428.41 | FIT | Single/5 | 91.63 | | |
| Regular | 7334.03 | SOCSEC | | 460.56 | | |
| Overtime | 94.38 | MEDICARE | | 107.71 | | |
| | | NY SIT | | 128.90 | | |
| | | NY PFL | | 9.36 | | |
| | | NY-New York City Resident LIT | | 95.10 | | |
| | | | New York voluntary disability 0.50% | 0.50% | 12.00 | Check |

**Altarejo, Richard**
Home Phone:
Mobile:
Hourly: 13.5000
SSN:
Hire Date: 9/11/2018
Birth Date:
Department: 250 - GB Bakery
Status: Active
Emp Type: Full time

| Earnings | | Taxes | Withholding | YTD Amount | Deductions | Disbursement Type |
|---|---|---|---|---|---|---|
| Gross | 695.25 | FIT | Single/0 | 61.41 | | |
| Regular | 675.00 | SOCSEC | | 43.11 | | |
| Overtime | 20.25 | MEDICARE | | 10.08 | | |
| | | NY SIT | | 20.44 | | |
| | | NY PFL | | 0.88 | | |
| | | NY-New York City Resident LIT | | 15.20 | | |
| | | | New York voluntary disability 0.50% | 0.50% | 1.20 | Check |

**Barcena, Placido**

| Earnings | | Taxes | Withholding | YTD Amount | Deductions | Disbursement Type |
|---|---|---|---|---|---|---|
| Gross | 9950.00 | FIT | Single/0 | 892.50 | | |
| Regular | 9950.00 | SOCSEC | | 616.38 | | |
| | 0.00 | MEDICARE | | 144.66 | | |



Emp Type: Full time
Chavarria, Victor M
Home Phone:
Mobile:
Hourly: 13.0000
SSN:
Birth Date: 5/21/2018
Hire Date: 5/21/2018
Department: 220 - GB Bakery
Status: Active

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross | 8428.84 | FIT | Single/0 | 646.24 | New York voluntary disability | 0.50% |
| Regular | 3040.00 | SOCSEC | | 336.59 | | |
| Overtime | 2388.84 | MEDICARE | | 78.72 | | |
| | | NY SIT | | 253.54 | | |
| | | NY PFL | | 6.94 | | |
| | 240.00 | NY-New York City Resident LIT | | 171.99 | | 3.80 | Check |
| | 126.59 | | | | | |

Emp Type: Full time
Cordova, Manuel
Home Phone:
Mobile:
Hourly: 14.5000
SSN:
Birth Date: 7/29/2010
Hire Date: 7/29/2010
Department: 220 - GB Bakery
Status: Active

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross | 22800.55 | FIT | Single/Head of Household/0/1 | 2678.78 | New York voluntary disability | 0.50% |
| Regular | 14200.00 | SOCSEC | | 1413.63 | | |
| Overtime | 8000.55 | MEDICARE | | 330.61 | | |
| Vacation | 540.00 | NY SIT | | 1004.99 | | 16.20 | Check |
| | 1040.00 | NY PFL | | 28.73 | | |
| | 391.51 | | | | | |
| | 40.00 | | | | | |

Emp Type: Full time
Cordova, Roberto
Home Phone:
Mobile:
Hourly: 12.0000
SSN:
Birth Date:
Hire Date: 12/31/2008
Department: 220 - GB Bakery
Status: Active

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross | 14698.82 | FIT | Married/1 | 877.35 | New York voluntary disability | 0.50% |
| Regular | 10080.00 | SOCSEC | | 929.60 | | |
| Overtime | 4436.82 | MEDICARE | | 217.45 | | |
| Vacation | 480.00 | NY SIT | | 578.31 | | 13.20 | Check |
| | 840.00 | NY PFL | | 18.88 | | |
| | 246.49 | | | | | |
| | 40.00 | | | | | |

Emp Type: Full time
Corporon, Claire E
Home Phone:
Mobile:
Hourly: 13.0000
SSN:

| | | | | |
|---|---|---|---|---|
| Gross | 8875.07 | FIT | Single/0 | 911.74 | | Check |
| Regular | 6555.04 | SOCSEC | | 612.05 | |
| Overtime | 319.03 | MEDICARE | | 143.18 | |
| | 785.08 | CT SIT | No form submitted/0/0 | 660.25 | |
| | 16.35 | | | | |

Danorro, Gilda
Hire Date: 6/6/2017
Birth Date: ████
Department: 200 - Port Chester
Status: Active
Emp Type: Full time
Home Phone: ████
Mobile:
Hourly: 11.0000
SSN: ████
Birth Date: 4/6/2013

| | | | |
|---|---|---|---|
| Regular | 312.62 | FIT | 16.17 |
| | 312.62 | SOCSEC | 19.38 |
| | | MEDCARE | 4.53 |
| | | NY SIT | 6.04 |
| | | NY PFL | 0.39 |
| | | NY-New York City Resident LIT | 4.51 |

Single/1

New York voluntary disability  0.50%

0.50

Check

DIAS, OTTO
Status: Active
Department: 250 - GB Packing
Hire Date: 4/2/2013
Birth Date: ████
SSN: ████
Hourly: 11.0000
Mobile:
Home Phone: ████

| | | | |
|---|---|---|---|
| Gross | 788.15 | FIT | 24.91 |
| Regular | 440.00 | SOCSEC | 48.87 |
| Overtime | 348.15 | MEDCARE | 11.43 |
| | 40.00 | NY SIT | 27.57 |
| | 21.10 | NY PFL | 0.99 |
| | | NY-New York City Resident LIT | 19.04 |

Single/Head of Household/1

New York voluntary disability  0.50%

0.60

Check

Single/5

Firincioln, Juda
Status: Active
Emp Type: Full time
Hire Date: 5/7/2018
Birth Date: ████
Department: 250 - GB Bakery
Home Phone: ████
Mobile:

| | | | |
|---|---|---|---|
| Gross | 7290.00 | FIT | 559.50 |
| Regular | 7290.00 | SOCSEC | 451.98 |
| | 0.00 | MEDCARE | 105.71 |
| | | CT SIT | 7.83 |

Filing Status A/00

Single/00

Check

Gonsalea, Juan
Status: Active
Department: 100 - Stamford
Birth Date: ████
Hire Date: 10/14/2013
SSN: ████
Salary Per Pay: 270.00
Mobile:
Home Phone: ████
Emp Type: Full time

| | | | |
|---|---|---|---|
| Gross | 18534.11 | FIT | 48.72 |
| Regular | 11640.00 | SOCSEC | 1157.71 |
| Overtime | 5554.11 | MEDCARE | 273.09 |
| | 1080.00 | | |
| | 397.76 | | |

Married/5

16.80

Check

Home Phone:
Mobile:
Hourly: 11.0000
SSN: ████
Hire Date: 5/5/2013
Birth Date: ████
Department: 240 - GB Utility
Status: Active
Emp Type: Full time

| | | | | | |
|---|---|---|---|---|---|
| Vacation | 440.00 | 40.00 | NY SIT NY PFL | Married/6 | 653.21 23.73 | New York voluntary disability 0.50% | 6.00 Check |

Gutierrez, Jessica
Home Phone:
Mobile:
Hourly: 13.0000
SSN: ████
Hire Date: 4/23/2018
Birth Date: ████
Department: 200 - Port Chester
Status: Active
Emp Type: Full time

| Gross Regular Overtime | 3965.95 3941.21 25.74 | 303.17 1.32 | FIT SOCSEC MEDICARE NY SIT NY PFL | Single/1 | 259.71 245.65 57.52 101.19 4.99 | Single/Head of Household/1 |
|---|---|---|---|---|---|---|

Hernandez, Andrea
Home Phone:
Mobile:
Hourly: 12.0000
SSN: ████
Hire Date: 4/23/2018
Birth Date: ████
Department: 230 - GB Bakery
Status: Active
Emp Type: Full time

| Gross Regular Overtime | 1383.91 920.00 463.91 | 80.00 25.47 | FIT SOCSEC MEDICARE NY SIT NY PFL NY-New York City Resident LIT | Single/0 Single/Head of Household/0 | 141.65 85.80 20.07 57.56 1.76 38.67 | New York voluntary disability 0.50% | 1.20 Check |

Heyward, Christina M
Home Phone:
Mobile:
Salary Per Pay: 975.39
SSN: ████
Hire Date: 12/31/2008
Birth Date: ████
Department: 270 - Management
Status: Active
Emp Type: Full time

| Gross Regular | 24588.00 24588.00 | 0.00 | FIT SOCSEC MEDICARE NY SIT NY PFL | Single/1 Single/Head of Household/1 | 2862.20 1510.87 353.35 1104.06 30.69 | New York voluntary disability 0.50% | 18.20 Check |

**Huemani, Leydy C**
Home Phone:
Mobile:
Hourly: 11.0000
SSN:
Hire Date: 6/25/2018
Birth Date:
Department: 250 - GB Packing
Status: Active
Emp Type: Full time

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross | 237.49 | FIT | 16.53 | New York voluntary disability | 0.50% | Check |
| Regular | 237.49 | SOCSEC | 14.72 | | | |
| | | MEDICARE | 3.44 | | | |
| | 21.59 | NY SIT | 3.81 | | | |
| | | NY PFL | 0.30 | | | |
| | | NY-New York City Resident LIT | 2.90 | | | |
| | | Single/0 | | Post Health | 25 | 675.00 |

**Jocelyn, Jean Raymond**
Home Phone:
Mobile:
Salary Per Pay: 590.00
SSN:
Hire Date: 1/7/2009
Birth Date:
Department: 100 - Stamford
Status: Active
Emp Type: Full time

| | | | | | |
|---|---|---|---|---|---|
| Gross | 15900.00 | FIT | 1520.40 | New York voluntary disability | 0.50% |
| Regular | 15900.00 | SOCSEC | 934.96 | | |
| | | MEDICARE | 218.69 | | |
| | 0.00 | CT SIT | 443.32 | | |
| | | Single/00 | | | |
| | | Filing Status A/00 | | | |

**Kaña, Check**
Home Phone:
Mobile:
Hourly: 12.5000
SSN:
Hire Date: 9/20/2013
Birth Date:
Department: 250 - GB Bakery
Status: Active
Emp Type: Full time

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross | 18863.41 | FIT | 1040.00 | New York voluntary disability | 0.50% | 16.20 | Check |
| Regular | 11890.00 | SOCSEC | 381.70 | | | | |
| Overtime | 6563.41 | MEDICARE | 40.00 | | | | |
| Vacation | 440.00 | NY SIT | | | | | |
| | | NY PFL | | | | | |
| | | NY-New York City Resident LIT | | | | | |
| | | Single/2 | | | | | |

| | | | | |
|---|---|---|---|---|
| | | FIT | 1474.92 | |
| | | SOCSEC | 1169.53 | |
| | | MEDICARE | 273.52 | |
| | | NY SIT | 724.59 | |
| | | NY PFL | 23.74 | |
| | | NY-New York City Resident LIT | 500.98 | |
| | | Single/Head of Household/2 | | |

**Home Phone:**

**Laguan, Maritere**
Home Phone:
Mobile:
SSN:

| | | | | | |
|---|---|---|---|---|---|
| Gross | 11273.30 | FIT | 839.31 | New York voluntary disability | 0.50% | 15.60 | Check |
| Regular | 10788.87 | SOCSEC | 28.43 | | | |
| Overtime | 480.43 | MEDICARE | | | | |
| | | NY SIT | | | | |
| | | NY PFL | | | | |
| | | Single/Head of Household/2 | | | | |

| | | | |
|---|---|---|---|
| | | FIT | 555.50 |
| | | SOCSEC | 869.22 |
| | | MEDICARE | 183.55 |
| | | NY SIT | 288.74 |
| | | NY PFL | 14.21 |

**Hourly: 11.5000**
SSN:

0.00 Check

**Lopez, Jesus Ulises**
Hire Date: 9/11/2012
Birth Date: [redacted]
Department: 250 - GB Packing
Status: Active
Emp Type: Full time
Home Phone: [redacted]
Mobile:
Hourly: 12.0000
SSN: [redacted]

| | Gross | FIT | Single/Head of Household6 | | New York voluntary disability | 0.50% | 8.00 | Check |
|---|---|---|---|---|---|---|---|---|
| Regular | 4590.00 | SOCSEC | | 231.35 | | | | |
| Overtime | 2468.45 | MEDICARE | | 435.76 | | | | |
| Gross | 7028.45 | NY SIT | | 101.81 | | | | |
| | 400.00 | NY PFL | | 231.87 | | | | |
| | 145.02 | NY-New York City Resident LIT | | 8.86 | | | | |
| | | | | 164.91 | | | | |

**Montoya, Erika**
Hire Date: 4/22/2018
Birth Date: [redacted]
Department: 230 - GB Bakery
Status: Active
Emp Type: Full time
Home Phone: [redacted]
Mobile:
Hourly: 13.0000
SSN: [redacted]

| | Gross | FIT | Single/Head of Household00 | | New York voluntary disability | 0.50% | 16.58 | Check |
|---|---|---|---|---|---|---|---|---|
| Regular | 13317.20 | SOCSEC | | 2537.18 | | | | |
| Overtime | 9451.03 | MEDICARE | | 1440.53 | | | | |
| Vacation | 520.00 | NY SIT | | 337.39 | | | | |
| Gross | 22838.23 | NY PFL | | 1039.25 | | | | |
| | 1024.40 | | | 29.31 | | | | |
| | 483.64 | | | | | | | |
| | 40.00 | | | | | | | |

**Morales, Agustin G**
Hire Date: 3/7/2011
Birth Date: [redacted]
Department: 250 - GB Packing
Status: Active
Emp Type: Full time
Home Phone: 914-589-7873
Mobile:
Hourly: 11.0000
SSN: [redacted]

| | Gross | FIT | Married05 | | New York voluntary disability | 0.50% | 15.39 | Check |
|---|---|---|---|---|---|---|---|---|
| Regular | 5165.08 | SOCSEC | | 28.32 | | | | |
| Overtime | 615.46 | MEDICARE | | 356.39 | | | | |
| Gross | 5780.54 | NY SIT | | 83.82 | | | | |
| | 471.10 | NY PFL | | 51.11 | | | | |
| | 37.30 | | | 7.27 | | | | |

**Oñefia, Alida**
Hire Date: 7/13/2015
Birth Date: [redacted]
Department: 240 - GB Utility
Status: Active
Emp Type: Full time

| | Gross | FIT | Single/0 | | New York voluntary disability | 0.50% | 1.80 | Check |
|---|---|---|---|---|---|---|---|---|
| Gross | 1266.16 | | | 115.34 | | | | |

**Home Phone:** ███
**Mobile:** ███
**Hourly:** 11.0000
**SSN:** ███
**Hire Date:** 6/11/2018
**Birth Date:** ███
**Department:** 250 - GB Packing
**Status:** Active
**Emp Type:** Part time

| | Regular | SOCSEC | | 78.50 | New York voluntary disability | 0.60% | | 15.60 | Check |
| Overtime | 1265.00 | MEDICARE | | 18.35 | | | | | |
| | 1.16 | NY SIT | | 36.93 | | | | | |
| | 115.00 | NY PFL | | 1.90 | | | | | |
| | 0.07 | NY-New York City Resident LIT | | 26.82 | | | | | |

Single/Head of Household/0

**Pantora, Gilberto**
**Home Phone:** ███
**Mobile:** ███
**Hourly:** 11.0000
**SSN:** ███
**Hire Date:** 12/31/2008
**Birth Date:** ███
**Department:** 260 - GB Delivery
**Status:** Active
**Emp Type:** Full time

| Gross | 11400.00 | FIT | | 1070.00 | New York voluntary disability | 0.60% | | 6.00 | Check |
| Regular | 11400.00 | SOCSEC | | 708.80 | | | | | |
| | 1040.00 | MEDICARE | | 165.30 | | | | | |
| | | NY SIT | | 344.27 | | | | | |
| | | NY PFL | | 14.25 | | | | | |

Single/Head of Household/00

**Perez, Jose**
**Home Phone:** ███
**Mobile:** ███
**Hourly:** 12.5000
**SSN:** ███
**Hire Date:** 4/16/2018
**Birth Date:** ███
**Department:** 230 - GB Bakery
**Status:** Active
**Emp Type:** Full time

| Gross | 9730.41 | FIT | | 617.74 | New York voluntary disability | 0.60% | | 6.00 | Check |
| Regular | 4590.00 | SOCSEC | | 604.53 | | | | | |
| Overtime | 5190.41 | MEDICARE | | 141.38 | | | | | |
| | 400.00 | NY SIT | | 412.23 | | | | | |
| | 301.86 | NY PFL | | 12.29 | | | | | |
| | | NY-New York City Resident LIT | | 279.88 | | | | | |

Single/5

**Reyes Duarte, Diana M**
**Home Phone:** ███
**Mobile:** ███
**Hourly:** 11.0000
**SSN:** ███
**Hire Date:** 4/25/2018
**Birth Date:** ███

| Gross | 3806.47 | FIT | | 26.77 | New York voluntary disability | 0.60% | | | |
| Regular | 3687.53 | SOCSEC | | 236.19 | | | | | |
| Overtime | 121.94 | MEDICARE | | 53.24 | | | | | |
| | 335.23 | NY SIT | | 57.57 | | | | | |
| | 7.39 | NY PFL | | 4.80 | | | | | |
| | | NY-New York City Resident LIT | | 43.90 | | | | | |

Single/Head of Household/6

**Santiago, Juventino**
Emp Type: Part time
Status: Active
Department: 250 - GB Packing
Home Phone:
Mobile:
Hourly: 13.5000
SSN:
Hire Date: 8/18/2017
Birth Date:

| | | | Single/3 | | New York voluntary disability | 0.50% | Check |
|---|---|---|---|---|---|---|---|
| Gross | 6216.05 | FIT | | | | | |
| Regular | 5946.40 | SOCSEC | 388.40 | | 223.52 | | 8.51 |
| Overtime | 267.65 | MEDICARE | 90.13 | | 385.40 | | |
| | | NY SIT | 153.86 | | | | |
| | | NY PFL | 7.85 | | | | |

**Senica, Will A**
Emp Type: Full time
Status: Active
Department: 230 - GB Bakery
Home Phone:
Mobile:
Hourly: 12.0000
SSN:
Hire Date: 11/7/2017
Birth Date:

| | | | Single/Head of Household/5 | | New York voluntary disability | 0.50% | Check |
|---|---|---|---|---|---|---|---|
| Gross | 13602.83 | FIT | 813.30 | | 274.02 | | 12.00 |
| Regular | 9118.60 | SOCSEC | 265.08 | | 843.38 | | |
| Overtime | 4483.33 | MEDICARE | | | 197.24 | | |
| | | NY SIT | | | 408.62 | | |
| | | NY PFL | | | 17.14 | | |
| | | NY-New York City Resident LIT | | | 287.31 | | |

**Sattenwhite, Regis**
Emp Type: Full time
Status: Active
Department: 200 - Port Chester
Home Phone:
Mobile:
Hourly: 12.5000
SSN:
Hire Date: 2/2/2015
Birth Date:

| | | | Single/0 | | New York voluntary disability | 0.50% | Check |
|---|---|---|---|---|---|---|---|
| Gross | 428.88 | FIT | 34.31 | | 9.99 | | 2.14 |
| Regular | 428.88 | SOCSEC | | | 26.59 | | |
| | | MEDICARE | | | 6.22 | | |
| | | NY SIT | | | -0.00 | | |
| | | NY PFL | | | 0.53 | | |

**Vargas, Dina A**
Home Phone:

| | | | Single/0 | | New York voluntary disability | 0.50% | Check |
|---|---|---|---|---|---|---|---|
| Gross | 892.86 | FIT | 90.26 | | 82.53 | | 1.60 |
| Regular | 892.86 | SOCSEC | | | 61.58 | | |
| | | MEDICARE | | | 14.40 | | |
| | | NY SIT | | | 23.62 | | |



## GENERAL ASSIGNMENT AND BILL OF SALE

1.      **Sale and Transfer of Purchased Assets and Contract Rights.**  For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by that certain Asset Purchase Agreement dated as of July 31, 2018 (the "Asset Purchase Agreement"), by and among **BELDOTTI BAKERIES LLC**, a Connecticut limited liability company ("Seller"), **RM BAKERY LLC**, a Delaware limited liability company, or its affiliate or designee ("Purchaser"), and **MICHAEL BELDOTTI**("MB") and **CHRISTOPHER BELDOTTI** ("CB" and together with MB, "Owners"),  Seller hereby sells, transfers, assigns, conveys, grants and delivers to Purchaser and its successors and assigns, effective as of the Closing Date, all of Seller's right, title and interest in and to the Purchased Assets.

2.      **Terms of the Asset Purchase Agreement.**  The terms of the Asset Purchase Agreement, including but not limited to Seller's representations, warranties, covenants, agreements and indemnities set forth therein, are incorporated herein by this reference.  Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the fullest extent provided therein.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3.      **Capitalized Terms.**  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

**IN WITNESS WHEREOF,** Seller has executed this General Assignment and Bill of Sale as of the Closing Date.

**BELDOTTI BAKERIES LLC**

By: _____

Name: _____

Title: _____

#1436352

## Schedule 7.1
### Transferred Employees

Heyward, Christina M
Cordova, Manuel
Cordova, Roberto
Kaba, Cheick